35 A.3d 1163

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. ROY FRIEDMAN, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued October 11, 2011—Decided January 24, 2012.

104

*Teresa M. Garvey,* Assistant Prosecutor, argued the cause for appellant and cross-respondent (*Warren W. Faulk,* Camden County Prosecutor, attorney).

*Susan C. Green,* Deputy Public Defender II, argued the cause for respondent and cross-appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Jeanne Screen* argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

*Alison S. Perrone* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey.

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

In this appeal we are called upon to consider whether the Appellate Division correctly applied the No Early Release Act, *N.J.S.A.* 2C:43–7.2 (NERA), when it concluded that a defendant who has been sentenced to three consecutive terms under that statute serves the periods of post-release parole supervision that are part of a NERA sentence concurrently rather than consecutively. We conclude that the periods of parole supervision must be served consecutively and thus reverse the contrary determination of the Appellate Division.

We are also called upon to consider in conjunction with this appeal whether *State v. Hess,* 207 *N.J.* 123, 23 *A.*3d 373 (2011), mandates that we strike down a provision of defendant's plea bargain, under which he agreed his attorney would not seek at the time of sentencing to have the trial court impose a concurrent sentence, as opposed to the consecutive sentence to which he had agreed. After carefully reviewing the record in this matter, we can perccive no basis to intervene in defendant's sentence.

## I.

These questions come to us in the following factual and procedural context. Defendant was married to his wife for more than twenty years. Together, they had three children. The record before us does not indicate anything untoward between defendant and his wife for most of those years. For reasons that cannot be fathomed, and are indeed immaterial, defendant began to abuse his wife physically. She had to seek medical attention and on several occasions had to be hospitalized to treat the injuries she received at his hand. Despite the pleas of the physician who treated her for her injuries, she resisted seeking legal recourse. She persisted in this course for an extended period of time. Eventually, however, she acceded to these entreaties and defendant was arrested and charged for his assaults upon her. A grand jury originally returned an indictment against him that contained more than one hundred counts, alleging offenses against defendant's wife and two of his children for the period from September 2005 through December 2006. The indictment was later amended, and the number of counts was reduced to fifty.

On March 28, 2008, defendant entered a negotiated plea of guilty to three of the fifty counts. In light of the nature of the arguments presented to us, we deem it important to set forth, in more detail than we otherwise might, the details of the proceedings on that date.

The prosecutor, in placing the terms of the plea bargain upon the record, described it in the following manner: defendant agreed to plead guilty to Count 9, charging him with second-degree aggravated assault upon his wife in violation of *N.J.S.A.* 2C:12–1(b) during the period between June 12, 2006 and July 17, 2006, and the State would recommend a sentence not to exceed six years, subject to NERA; to Count 13, charging him with second-degree aggravated assault upon his wife in violation of *N.J.S.A.* 2C:12–1(b) during the period between September 29, 2006 and October 3, 2006, and the State would recommend a sentence not to exceed seven years, subject to NERA, to be served consecutively

to the sentence to be imposed under Count 9; and to Count 22, charging him with second-degree aggravated assault upon his wife in violation of *N.J.S.A.* 2C:12–1(b) during the period between December 11, 2006 and December 14, 2006, and the State would recommend a sentence not to exceed seven years, subject to NERA, to be served consecutively to the sentences to be imposed under Counts 9 and 13. The State agreed as part of the bargain that the remaining forty-seven counts of the indictment would be dismissed. The assistant prosecutor handling the prosecution also noted that the agreement reached included the following provision:

He [defendant] also agrees to waive any claim—including any claim under State - vs- Yarbough regarding [the] consecutive nature of the sentence for these counts. In other words, he agrees that he can't argue or will not argue that those sentences could not be imposed consecutively.

The assistant prosecutor also noted that defendant agreed to acknowledge the accuracy of the records maintained by the physician who treated his wife for the injuries she received from him. Defendant's counsel acknowledged that the assistant prosecutor had correctly recited the terms of the plea bargain.

Defendant was then placed under oath, and the trial court carefully questioned him about his understanding of, and his concurrence with, the terms of the agreement. The trial court then questioned defendant with respect to his guilty plea to Count 9.

Q. Now, I draw your attention back to June 12, 2006 through the time period of 7/17, July 17 of 2006. Between those dates did you burn your wife's arm with hot oven racks from a toaster oven?

A. Yes.

Q. And you did realize on that date that due to previous injuries that had been inflicted to that same area that you knew or had reason to believe it was going to cause serious permanent injury?

A. Yes.

Q. And what I mean by serious permanent injury as defined by statute, that you knew it was going to cause serious permanent disfigurement, correct?

A. Yes.

Q. And as a result of those burns, your wife had to be hospitalized for severe and life-threatening infection?

A. Yes.

## The trial court then took up defendant's plea of guilty to Count 13.

Q. All right. Now, under Count 13. Count 13 alleges that between 29th day of September, 2006 and October 3, 2006 you committed another aggravated assault of the second-degree ..., when you attempted to cause serious bodily injury to [your wife] or caused serious bodily injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life caused such serious bodily injury. Again, another second-degree crime that could carry the maximum ten years 85 percent without the benefit of this plea agreement.

Do you understand that charge?

A. Yes.

Q. Guilty or not guilty?

A. Guilty.

Q. Now, between those dates, September 29th of 2006 and October 3 of 2006, did you again burn your wife's arm with the hot oven racks from the toaster oven?

A. Yes.

Q. Same arm you burned on the prior occasion?

A. Yes.

Q. At that point your wife had to be hospitalized for skin graft to her arm. Is that correct?

A. Yes.

Q. You're aware that that area never healed properly. Am I correct?

A. Yes.

Q. And that she, in fact, has serious permanent disfigurement to that arm?

A. Yes.

## The trial court then turned to Count 22.

Q. And then, finally, Count 22 alleges that between the dates of December 11, 2006 and December 14th of 2006 ... in Camden County, you attempted to cause serious bodily injury to your wife ... or caused such serious bodily injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly caused serious bodily injury.

Do you understand that charge?

A. Yes.

Q. Guilty or not guilty?

A. Guilty.

Q. Again, I draw your attention back to December 10th of 2006 through—

[ASSISTANT PROSECUTOR]: I believe it's the 11th.

THE COURT: I'm sorry.

Q. December 11th. Between the dates of December 11, 2006 and December 14th of 2006, did you burn your wife's thigh with hot oven racks from a toaster oven?

A. Yes.

Q. Due to previous burns that had been occasioned to that particular area of her thigh you knew it was going to cause permanent disfigurement to her leg?

A. Yes.

Q. As a result of those burns inflicted between those dates, December 11th of 2006 and December 14th of 2006, your wife had to be hospitalized again for life-threatening injury?

A. Yes.

Q. Correct?

A. Yes.

In response to further questions from the trial court, defendant specifically acknowledged the accuracy of his wife's medical records and that he was responsible for his wife's injuries recounted in those records.

The trial court reviewed for defendant the terms of the sentence recommendations the State had agreed to make, as well as the potential sentencing consequences for defendant if he had proceeded to trial and been convicted on all counts. The trial court confirmed that defendant understood that if he were convicted at trial of all these charges, his sentencing exposure was "well beyond the 20 years which would be the maximum [defendant] could receive under the terms of this plea bargain." It thus indicated that although such a sentence was likely illegal, theoretically, defendant could have received a sentence in excess of five hundred years, with nearly four hundred years of parole ineligibility. Defendant assured the trial court that he understood that.

The trial court then reviewed with defendant the manner in which the prosecutor's sentencing recommendation was structured, noting with respect to each component that it carried a three-year period of parole supervision following his ultimate release from incarceration. The trial court also explained to defendant the consequences if he were to violate the terms of his parole supervision.

In response to a question from defendant, the trial court also explained that by virtue of defendant receiving consecutive sentences, he would also serve consecutive periods of parole supervi-

sion. Defendant acknowledged his understanding. The trial court had the following colloquy with defendant:

Q. Now, in addition to that you understand that these sentences will be consecutive and you waive any claim to object to these three consecutive sentences under State -vs- Yarbough as well as other cases that have talked about consecutive sentences.

Your lawyer explained all that. Am I correct?

A. Yes.

Q. You understood it all?

A. Yes.

Additionally, the trial court reviewed in detail with defendant the various rights that he was surrendering by pleading guilty. In response to the trial court's questions, defendant assured the trial court that no one had pressured him to plead guilty or promised him anything beyond what the trial court had reviewed with him and that he was satisfied with the services his attorney had provided him.

The trial court also reviewed for defendant what would take place when he returned to the court for sentencing.

Q. Sentencing date would be May 30th. On that date, as you know, you have a range. The cap is 20 years, 15 to 20 years, 85 percent without parole. I'll make the determination on that day what your sentence is. I do that as a result of a full hearing which takes place. In that full hearing the prosecutor will be here and your attorney will be here. Certainly you'll be here. And I'll review letters that have been submitted on behalf of yourself, on behalf of the State which would include sentencing memoranda. Those normally contain arguments.

I'll hear from the State and any victims of this particular crime, your wife included, and any other indirect victims that may be involved in this. Also, I'll hear from your attorney and I'll hear from you on the date of sentencing and I'll make a determination on that date taking into consideration what's been said at that date, full history of the case as I know it to be, reach a determination on what the interest of justice dictates to be a fair sentence.

Do you understand that?

A. Yes.

Q. Now, I do have a right on that date to reject this plea agreement if I don't believe it's just. For example, if I thought it was too lenient, I can just say no, I'm not going to accept this plea agreement. But if I did that, you'd have a right to take back your three guilty pleas that you've entered today and nothing you told me about what happened between yourself and your wife on those dates we talked about could later on be used against you at trial to prove you committed any crimes contained in this entire indictment.

At the conclusion of the plea proceedings, the trial court made the following findings.

> THE COURT: Mr. Friedman, I do make findings that you have, in fact, retracted your not guilty plea and entered guilty pleas to Counts 9, 13 and 22. You have given me factuals that are consistent with those guilty pleas, consistent that you knowingly and purposely caused serious bodily injury to your wife. S–1, S–2 are indicative of injuries that caused significant and serious permanent disfigurement, so they meet the test of serious injury that's required under these counts of the indictment. So the factual is consistent with your guilty pleas.
>
> I also find that you've entered these guilty pleas and accepted the offer that the State has extended. You've done this freely, knowingly and voluntarily; not as a result of any outside influences that would affect your ability to think or reason or understand the nature and consequences of your acts.
>
> I make this determination based upon several items: Your attorney's representation to the Court, your completion of the plea forms, your acknowledgment of the answers to the plea forms being accurate and correct as evidenced by your signature, your incorporation by reference of the answers to the plea forms by representations to this Court.
>
> And, very important, your demeanor before the Court. You've engaged the Court in discussions. Where you've had questions, you've asked those questions. You did involve intricately, I know, from representations of counsel in the negotiation process and accepting responsibility for what you did on those various dates. And having made those findings, I will accept this guilty plea, enter a finding of guilty and revoke your bail.

Prior to sentencing, defendant's attorney prepared and submitted a sentencing memorandum. Attached to that sentencing memorandum were a number of letters written on defendant's behalf, all requesting leniency for him. Within that memorandum, defendant's attorney reviewed the statutory aggravating and mitigating factors, *N.J.S.A.* 2C:44–1(a) and (b), and contended that the mitigating factors predominated. This, he urged the trial court, warranted imposing a sentence at the lowest range for a second-degree conviction. He stressed that defendant had only one prior conviction, for the disorderly persons offense of shoplifting; that the couple had been experiencing the stress of financial pressures; and that their marital discord was accentuated by disagreements as to where they should reside, leading defendant to fear abandonment. Defendant's behavior, he argued, was aberrational and the product of the circumstances in which he found himself at the time and therefore unlikely to recur. Defendant's attorney also argued

in his sentencing memorandum that the period of parole supervision required by NERA should be served concurrently, rather than consecutively. At sentencing, defendant's attorney stressed those same arguments in his oral presentation on behalf of his client, noting also that defendant was fifty-one years old, and the couple had been married for nearly twenty-five years before the physical abuse commenced.

At the sentencing proceeding, the trial court heard from the State and defendant's attorney, as well as defendant's wife and defendant himself. Defendant expressed remorse for his actions and also asked for a sentence at the lower part of the range. The trial court also considered a statement submitted by one of defendant's daughters that recited the psychological dysfunction that had marked the family dynamics.

The trial court then proceeded to analyze the legal arguments the attorneys had presented, addressing each of the aggravating and mitigating factors upon which the attorneys had relied, and it set forth its reasons for concluding that the sentence recommended when the parties placed their plea bargain on the record was the appropriate sentence for this defendant. In the course of its sentencing analysis, the trial court, after noting that defendant had stipulated as part of his plea bargain that his sentences were to be served consecutively, analyzed the conduct to which defendant had pled guilty. It noted that he had pled guilty to three separate acts of violence against his wife that occurred at separate times. The trial court noted the principles enunciated in *State v. Yarbough*, 100 *N.J.* 627, 498 *A.*2d 1239 (1985), *cert. denied*, 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), and concluded that regardless of defendant's stipulation, consecutive sentences were entirely appropriate.

It also paused at one point in the course of its detailed analysis to note what the court described as the "fine advocacy" of defendant's attorney and that, in the court's view, defendant should be grateful to his attorney.

He was tenacious in his representation, honest and open in his representation, and that's why you're standing in the position you are today with an exposure of only 20 years in state prison, because we all know—we did the numbers—you were looking at multiple life sentences if we took the numbers and added them up.

The trial court ultimately imposed the sentence recommended by the State at the time defendant entered his guilty plea. As part of the sentence, the trial court directed that defendant's periods of parole supervision be served consecutively.

Defendant thereafter appealed his sentence, and the matter was heard on the Appellate Division's calendar devoted to sentence matters. *R.* 2:9–11. Defendant's attorney presented several arguments to the Appellate Division: the sentencing court used inflammatory language that demonstrated it was not neutral and, thus, defendant was entitled to be resentenced before another court; the terms of the plea bargain that barred defendant from arguing in favor of concurrent terms were improper; and the sentence was excessive. Defendant's attorney made clear, however, that defendant was not seeking to have the plea bargain set aside. The Appellate Division rejected defendant's contentions in an order entered December 29, 2009. In the order, the panel noted that defendant did not challenge the imposition of consecutive periods of parole supervision, and thus it declined to address the question.

Upon receipt of the order, defendant moved for reconsideration, seeking the opportunity to address that question. The Appellate Division granted defendant's motion and set a briefing schedule. After argument, the Appellate Division ruled that defendant's periods of parole supervision pursuant to *N.J.S.A.* 2C:43–7.2 must be served concurrently even though defendant was sentenced to serve consecutive NERA terms of imprisonment. *State v. Friedman,* 413 *N.J.Super.* 480, 491, 996 *A.*2d 457 (App.Div.2010). The panel relied upon the language of the statute, which specifies that " 'the term of parole supervision [of an inmate serving a NERA sentence] shall commence immediately upon his release from incarceration.' " *Id.* at 487, 996 *A.*2d 457 (quoting *N.J.S.A.* 2C:43–7.2(c)). The panel reasoned that if the periods of parole supervi-

sion were imposed consecutively, the second and third parole terms would not start "immediately upon his release" from prison. *Id.* at 491, 996 *A.*2d 457. Therefore, the panel concluded that by the language of the statute, the parole terms must be concurrent. *Ibid.* Thereafter, the State petitioned and defendant cross-petitioned for certification. We granted both petitions. 204 *N.J.* 39, 6 *A.*3d 442 (2010).

## II.

On appeal, the State argues that the imposition of consecutive sentences under *N.J.S.A.* 2C:43–7.2 requires that the parole supervision periods that are a concomitant of a NERA sentence also run consecutively. It presents three reasons in support of its position.

First, it asserts that the result reached by the Appellate Division runs afoul of the legal principle that sentences cannot be both consecutive and concurrent but, rather, must be wholly one or the other. According to the State, the Appellate Division erred when it concluded that this principle is inapplicable to periods of parole supervision. The State also maintains that the imposition of concurrent periods of parole supervision with consecutive periods of incarceration is inconsistent with sentencing procedures applied under statutes other than NERA. According to the State, there is no legislative indication that NERA sentences should operate in a different fashion. The third reason put forth by the State rests upon the Legislature's intent when it enacted NERA. It stresses that the primary goal of the Legislature was to assure the longest period of incarceration possible for violent offenders. According to the State, it would be inconsistent with this legislative goal to construe the statute in a way as to result in a lesser period of parole supervision.

Defendant's response to the arguments put forth by the State rests upon the statutory phrase "immediately upon release." He asserts that this language requires that NERA periods of parole supervision must all commence upon an offender's release from incarceration and, therefore, must run concurrently.

In his cross-petition, defendant presents five additional contentions. First, he argues that the plea agreement unduly constricted his attorney by precluding him from arguing in favor of a concurrent sentence, thus denying him effective assistance from his attorney at a critical juncture. Second, he contends that the trial court did not conduct an adequate analysis under *State v. Yarbough, supra,* when it directed that his sentences be served consecutively. Defendant's third assertion is that the trial court's language during the course of the sentencing proceeding indicated that the trial court did not view him in a neutral manner but, rather, let its sentencing views be influenced by defendant's religious identity. Defendant's fourth contention is that the trial court, in imposing its sentence, sought to punish defendant for more than the three counts of the indictment to which defendant pled guilty. Finally, defendant asserts that his sentence is manifestly excessive and the trial court did not give sufficient weight to the applicable mitigating factors.

The State counters defendant's arguments. It rejects his contention that the provision of the plea agreement under which defendant agreed that his attorney would not seek concurrent sentences deprived him of effective assistance from his attorney. The State asserts the provision was entirely appropriate. It stresses that the plea bargain was no more than a sentence recommendation that in no way bound the sentencing court. It analyzes the language upon which defendant rests his contention of bias on the part of the sentencing court and argues it is not reflective of bias but, rather, the trial court's understandably strong reaction to the conduct which defendant admitted committing. It asserts that defendant's sentence, an aggregate twenty years subject to the terms of NERA, was appropriate and the trial court's sentencing calculus was entirely correct.

### III.

We turn first to the question of whether an individual sentenced to consecutive periods of incarceration under NERA must serve

the accompanying periods of parole supervision consecutively as well, or whether they are to be served concurrently.

*N.J.S.A.* 2C:43–7.2 contains four subsections. Subsection (a) mandates that a court imposing a sentence under NERA "shall fix a minimum term of 85% of the sentence imposed, during which the defendant shall not be eligible for parole." Subsection (b) sets forth the methodology for calculating an individual's parole eligibility date and subsection (d) lists the offenses for which a trial court must impose NERA's terms upon an individual's conviction. Included among those offenses is *N.J.S.A.* 2C:12–1(b), the crime to which defendant entered three successive pleas of guilty.

Subsection (c) deals with parole supervision for an individual sentenced under NERA. This provision, the Appellate Division noted in *State v. Freudenberger,* 358 *N.J.Super.* 162, 168, 817 *A.*2d 371 (App.Div.2003), is "unique and radically different" from the general parole statute, *N.J.S.A.* 30:4–123.45 to .95. Subsection (c) of *N.J.S.A.* 2C:43–7.2 states in pertinent part:

> Notwithstanding any other provision of law to the contrary and in addition to any other sentence imposed, a court imposing a minimum period of parole ineligibility of 85 percent of the sentence pursuant to this section shall also impose . . . a three-year term of parole supervision if the defendant is being sentenced for a crime of the second degree. The term of parole supervision shall commence upon the completion of the sentence of incarceration imposed by the court pursuant to subsection a. of this section unless the defendant is serving a sentence of incarceration for another crime at the time he completes the sentence of incarceration imposed pursuant to subsection a., in which case the term of parole supervision shall commence immediately upon the defendant's release from incarceration. During the term of parole supervision the defendant shall remain . . . in the legal custody of the Commissioner of the Department of Corrections. . . .

The consequence of this language is that an individual who is under parole supervision after having served 85% of his or her specified sentence in custody and then violates a condition of that parole may be returned to custody not only for the balance of the original custodial term, but for the remaining length of the parole supervisory period.

> Where [NERA] applies, it changes sentencing drastically. The required incarceration of 85% of the sentence during which the defendant is not eligible for parole will almost always be far longer than any minimum sentence set by the court. As a

result, the maximum sentence becomes far more significant than the minimum for all purposes. That is entirely different from other sentences where it is the minimum that is the key factor in controlling the length of incarceration. In addition, 85% of the maximum sentence imposed usually will be more than the sentence reduced by credits. Thus, the whole sentence that was imposed, as reduced by credits, will have been served by the time the person is released under NERA. For that reason, subsection c. sets an additional parole time period for a person who is subject to this section. During this period, the person is subject to parole supervision; if a violation of parole conditions occurs, the parolee can be reincarcerated for the balance of the parole term.

[Cannel, *New Jersey Criminal Code Annotated,* comment 3 on *N.J.S.A.* 2C:43–7.2 (2011).]

The statute does not provide a specific directive as to whether periods of NERA parole supervision must be concurrent or consecutive for an offender who has been sentenced to consecutive custodial terms under NERA. We must therefore consider the language of the statute and the intent of the Legislature in light of settled principles of statutory interpretation.

Our role in interpreting a statute "is to determine and effectuate the Legislature's intent." *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009) (citing *D'Annunzio v. Prudential Ins. Co. of Am.,* 192 *N.J.* 110, 119, 927 *A.*2d 113 (2007)). We " 'look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen.' " *Ibid.* (quoting *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008)). We must, however, read the statute as a whole and not seize upon one or two words as a fixed guide to the meaning of the entirety. *Singh v. Sidana,* 387 *N.J.Super.* 380, 386 n.2, 904 *A.*2d 721 (App.Div.2006), *certif. denied,* 189 *N.J.* 428, 915 *A.*2d 1051 (2007) (" 'There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure.' ") (quoting *Central Hanover Bank & Trust Co. v. Commissioner,* 159 *F.*2d 167, 169 (2d Cir.), *cert. denied,* 331 *U.S.* 836, 67 *S.Ct.* 1518, 91 *L.Ed.* 1848 (1947)). " '[S]tatutes are to be read sensibly rather than literally. . . .' " *Mayfield v. Cmty. Med. Assocs., P.A.,* 335

*N.J.Super.* 198, 205, 762 *A.*2d 237 (App.Div.2000) (quoting *DeLisa v. County of Bergen,* 165 *N.J.* 140, 147, 755 *A.*2d 578 (2000)).

> Courts thus do not slavishly limit themselves to the dry words of legislation nor rely on mere abstract logic to determine what interpretation of a statute would fulfill the Legislature's purpose. More is called for than a merely mechanical analysis. Machines can perform mechanical tasks, but judgment is necessary to reach a result informed by intelligence.
>
> [*Ibid.*]

■ A court interpreting a statute must balance its fundamental duty not to substitute its views for those expressed by the Legislature in the language the Legislature selected in enacting a statute, *State v. Baker,* 198 *N.J.* 189, 193, 966 *A.*2d 488 (2009) ("We remain ever mindful that, 'when interpreting a statute, our overarching duty is to construe and apply the statute as enacted,'" (quoting *Daidone, supra,* 191 *N.J.* at 565, 924 *A.*2d 1193)) with the recognition that a literal reading of the words of a statute may not yield the Legislature's intended result. *Quest Diagnostics, Inc. v. Director, Div. of Taxation,* 387 *N.J.Super.* 104, 111, 903 *A.*2d 442 (App.Div.), *certif. denied,* 188 *N.J.* 577, 911 *A.*2d 69 (2006).

■ "'When all is said and done, the matter of statutory construction ... will not justly turn on literalisms, technisms, or the so-called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the common-sense of the situation.'" *LaFage v. Jani,* 166 *N.J.* 412, 431, 766 *A.*2d 1066 (2001) (alteration in original) (quoting *Jersey City Chapter Prop. Owner's Protective Assoc. v. City Council of Jersey City,* 55 *N.J.* 86, 100, 259 *A.*2d 698 (1969)).

■ In attempting to determine the objects the Legislature had in mind in enacting a statute, it is appropriate to examine the legislative history of the bill for whatever light it may shed upon that intent. *Warren County Bar Ass'n v. Bd. of Chosen Freeholders,* 386 *N.J.Super.* 194, 200, 899 *A.*2d 1028 (App.Div.), *certif. denied,* 188 *N.J.* 354, 907 *A.*2d 1014 (2006). While legislative history is most usually examined if a court is satisfied that the statutory language is ambiguous, *Thomsen v. Mercer–Charles,* 187 *N.J.* 197, 206, 901 *A.*2d 303 (2006), it is appropriate to look to the

legislative history as a tool to measure which construction of a statute's words will result in achieving the goals the Legislature was striving to reach by enacting the statute.

We have examined the legislative history of *N.J.S.A.* 2C:43–7.2, and it contains no direct statements with respect to the precise question before us. The Statement of the Senate Law and Public Safety Committee of April 24, 1996, however, clearly posits the Legislature's intention in enacting the bill as being "to increase prison time for offenders committing the most serious crimes in society." *S. Law & Pub. Safety Comm.,* Statement to S. No. 855 (Apr. 24, 1996).

In its original formulation, the bill made no provision for parole supervision of an inmate who completed the specified 85% of his or her sentence. Concerns about this were raised before the Senate Law and Public Safety Committee in the hearing it conducted on April 24, 1996. Further, the Study Commission on Parole appointed by then-Governor Whitman also noted that NERA, as then drafted, was silent with respect to any post-release supervision of an inmate upon completion of a NERA sentence. According to the Commission's report issued in December 1996,

> [m]ost inmates sentenced under the 85 percent requirement would be automatically released (i.e., "max out") on or shortly after the completion of the minimum fixed term of parole ineligibility prescribed by statute. The Parole Board would have neither the opportunity nor the authority to deny parole based on a prediction of future criminal behavior, the inmate's unwillingness to participate in treatment, or deficiencies in the inmate's parole plan. His or her release would be dictated by operation of law rather than by a discretionary decision of the Parole Board. [*Report of the Study Commission on Parole,* 10–11 (1996).]

The Commission also expressed its concern that the fifteen percent that remained of the original custodial term following the release of an inmate sentenced pursuant to NERA might not be an adequate deterrent to prevent the offender from returning to violent crime. It thus stressed the need for post-release monitoring and supervision. *Id.* at 14.

After this potential problem was recognized, the bill was amended to provide for mandatory fixed periods of parole supervi-

sion for NERA offenders. In our judgment, it is more consonant with the Legislature's objective—to protect the public from the risk posed by the release of violent offenders from incarceration— to have NERA periods of parole supervision run consecutively in the case of an individual who is sentenced to consecutive NERA sentences, rather than to have the periods of parole supervision run concurrently. We thus reject defendant's argument that the Legislature's use of the word "immediately" calls for concurrent service of periods of parole supervision for inmates who have served consecutive NERA sentences. Such a construction would not advance the Legislature's ultimate objectives underlying the passage of NERA.

Our view that such a construction is not in accord with the overall intent of the Legislature in its enactment of NERA is fortified by the language it selected when it incorporated mandatory parole supervision into the statute. Subsection (c) directs that a court imposing a sentence under NERA "shall also impose" the specified parole supervision period. *N.J.S.A.* 2C:43–7.2(c). Thus, a three-year period of parole supervision is an integral part of a NERA sentence for the second-degree crime of aggravated assault. *See State v. Cheung*, 328 *N.J.Super.* 368, 371, 746 *A.2d* 38 (App.Div.2000) (noting that the five-year period of parole supervision specified under NERA for a first-degree crime is mandatory, regardless of whether the matter is downgraded for sentencing under *N.J.S.A.* 2C:44–1(f)(2)). If an individual were to serve concurrent periods of parole supervision after completing consecutive custodial NERA terms, the individual would not serve the full NERA sentence, but only a portion of it. Accordingly, defendant, upon his release from incarceration, must serve his periods of parole supervision consecutively, not concurrently.

## IV.

### A.

We turn now to defendant's cross-petition, in which he asserts that that portion of his plea bargain under which he

agreed that his attorney would not argue at sentencing that the court should impose concurrent sentences, is unenforceable. In *State v. Hess, supra,* decided after this defendant pled guilty and was sentenced, we held that a defendant who acknowledged as part of her plea bargain that she would receive a sentence of thirty years in prison, with a twenty-five and one-half year period of parole ineligibility, further acknowledged that the aggravating factors outweighed the mitigating factors, and agreed as well that neither she nor her attorney would seek a lesser term at sentencing, had been deprived of the effective assistance of counsel because of restrictions in the plea agreement placed on counsel's right to argue for a lesser sentence. 207 *N.J.* at 129, 23 *A.*3d 373.

As we noted earlier, defendant does not seek to have the entire plea set aside. Rather, he only challenges that one aspect of the plea bargain.

There are several factors that distinguish this matter from that presented in *Hess.* We note, for instance, that defendant's attorney submitted a full sentencing memorandum to the court in advance of defendant being sentenced while the attorney for the defendant in *Hess* told the trial court at sentencing that his hands were "somewhat tied" by the terms of the plea bargain. *Id.* at 138, 23 *A.*3d 373. In particular, that attorney made no effort to advise the sentencing court of the evidence he had obtained during the course of representing the defendant, evidence indicating that she "was a physically and psychologically battered woman, who had been threatened and had feared for her life." *Ibid.*

The record before us contains no indication of any similar withholding from the trial court of information that could bear on the court's sentencing analysis. Indeed, as we noted earlier, this trial court at sentencing commented upon what it characterized as the "fine advocacy" of defendant's attorney, and his "tenacious" efforts on defendant's behalf.

Further, the information that was not disclosed to the sentencing court in *Hess* had the potential to affect the weight the sentencing court might ascribe to the relevant aggravating and

mitigating factors, *N.J.S.A.* 2C:44–1(a) and (b), many of which focus on potential individual characteristics of the individual awaiting sentencing. It is the defendant's attorney who best knows how to apply those statutory factors to assist the trial court in determining the appropriate quantum of the sentence.

The focus of the sentencing court in considering whether to impose concurrent or consecutive terms for multiple offenses is different, however, than its focus in determining a particular sentence for a particular offense. For the latter, the sentencing court looks primarily to the individual defendant while for the former, it looks at the offense. "[I]n fashioning consecutive or concurrent sentences under the Code, sentencing courts should be guided by the Code's paramount sentencing goals that punishment fit the crime, not the criminal, and that there be a predictable degree of uniformity in sentencing." *State v. Yarbough, supra,* 100 *N.J.* at 630, 498 *A.*2d 1239.

Although we have noted these distinctions, we decline to consider whether they are of such significance that *Hess* does or does not apply to this matter because there is no need for us to do so.

In *Yarbough, supra,* we summarized the principles that should guide a sentencing court when it considers the issue of whether sentences for multiple offenses should be served consecutively or concurrently. In doing so, we stated clearly, that "there can be no free crimes in a system for which the punishment shall fit the crime" and directed a sentencing court to consider, among other factors, whether "the crimes involved separate acts of violence or threats of violence" and whether "the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." *Id.* at 643–44, 498 *A.*2d 1239. Here, defendant in his plea colloquy admitted to three specific, separate assaults upon his wife: one in the summer months of 2006, the second in the fall of 2006, and the third in the early winter of 2006. The decision to impose three consecutive sentences for these three completely

separate events could hardly be characterized as an abuse of the trial court's sentencing discretion.

The trial court, moreover, did not rely upon this restriction. Rather, it recognized that the terms of a plea bargain do not control the inherent sentencing authority of the court and engaged in its own analysis of the principles stated in *Yarbough, supra,* and came to the conclusion that the only appropriate punishment for the separate offenses committed by this defendant was consecutive periods of incarceration.

## B.

Defendant complains of certain of the language used by the trial court in the course of its sentencing decision. Specifically, he objects to the court's description of him as a "domestic terrorist" and its reference to defendant's wife as a Holocaust survivor. We can find no hint of the religious bias that defendant asserts exists in this language. Nor can we find any basis to conclude that the sentencing proceeding was in any way tainted, no matter how inappropriate we might consider these remarks.

## C.

Defendant's final contention is that his sentence is excessive. We reject this out of hand. Defendant pled guilty to three second-degree crimes. The sentencing range for crimes of the second degree is five years to ten years. For his conviction under Count 9, defendant was sentenced to a term of six years, one year less than the mid-point of the sentencing range. For each of his convictions under Count 13 and Count 22, he was sentenced to seven years, the mid-point of the sentencing range. Defendant's sentences, at or below the mid-point of the sentencing range for the second-degree offenses to which defendant pled guilty, are not excessive.

## V.

For the reasons stated, the opinion of the Appellate Division is reversed and defendant's original sentence is reinstated.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, HOENS, PATTERSON and WEFING (temporarily assigned)—7.