**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5487-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FELIX RIVERA, a/k/a
FELIX RIVERA-PADILLA,

    Defendant-Appellant.

_____

Submitted November 18, 2020 – Decided December 17, 2020

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 17-05-0325.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Kelsey A. Ball, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Felix Rivera appeals from a February 14, 2017 Family Part decision[1] granting the State's application to waive defendant, who was then a sixteen-year-old juvenile charged with first-degree murder, to adult court. (Da75-88). He also appeals from his May 11, 2018 sentence. We affirm.

We derive the following facts from the record. The State's sole witness, Sergeant Johnny Ho of the Union County Prosecutor's Office, provided the following testimony at the waiver hearing.

On April 21, 2015, sometime around 9:00 p.m., seventeen-year-old Oscar Martinez Alvarez was fatally shot with a nine-millimeter gun. A cell phone was recovered from the victim's body and subsequently searched pursuant to a warrant for information relating to the crime. The investigation revealed the homicide was gang-related and identified defendant (a/k/a Chaco), Juan Antonio Barraza (a/k/a Shaggy), and Juan Diego Delgado (a/k/a Pana) as the individuals involved in the homicide. The investigation further identified defendant as the shooter. Defendant emigrated to the United States from El Salvador in 2013.

As part of his investigation, Sergeant Ho interviewed the following individuals associated with the street gang, the Mara Salvatrucha (commonly

---

[1] The record does not include a corresponding order. Only the court's written opinion was provided.

known as MS-13): Oscar Antonio Porteo-Guzman, Delgado, Alex Saldona (a/k/a Puma), and Barraza, who is a high-ranking member of MS-13.

Porteo-Guzman stated he knew the victim by the nickname "Moscow" and "believed that [the victim] was [a] MS-13 member . . . but may have been trying to switch to a different street gang." He also stated that on the day of the homicide, he received a phone call from Barraza who asked him to meet up with Barraza, Delgado, and defendant "to do something bad." Porteo-Guzman further stated that on the day after the homicide, he received a phone call from defendant who told him they (defendant, Barraza, and Delgado) "scored four goal[s]," which was code for "four shots or four bullets." Sergeant Ho testified Porteo-Guzman consented to a search of his cell phone; the search corroborated Porteo-Guzman's statements in that his cell phone contained Barraza, Delgado, and defendant's cell phone numbers and they were in contact as described by Porteo-Guzman.

Delgado stated he knew the victim by the nickname Dorsey and that the victim "was affiliated [with] the MS-13 gang, but . . . believed [the victim] was playing both sides, that being with the MS-13 and the 18th Street gangs." Delgado acknowledged he met with defendant and Barraza and "made plans to get the victim to meet with them" to "do something to him." Delgado stated he

contacted the victim to get him out of the house and met with him near the scene of the homicide. Delgado also stated defendant shot the victim. A search of Delgado's cell phone records revealed he called the victim as indicated in his statement.

Saldona stated that on the day of the homicide, he received a three-way call from Porteo-Guzman and Barraza asking him to meet up with them. At the time, Saldona was on the phone with the victim. Saldona responded to Porteo-Guzman and Barraza that he "was too tired and he did not want to go out."

Barraza stated he "believed the victim was a rat, that was trying [to] infiltrate the MS-13 organization." He acknowledged meeting up with defendant and Delgado on the day of the homicide to discuss "their plans to get the victim." Barraza stated defendant had a gun and the plan "was to contact the victim and get the victim to come out of the house" and "to take him up to the train tracks." Barraza also stated he was not present at the scene but was nearby and "heard three or four shots." Barraza further stated defendant and Delgado contacted him afterwards and "told him that it was done."

In July 2015, the State filed a juvenile delinquency complaint against defendant charging him an act of juvenile delinquency that if committed by an adult would constitute first-degree murder, N.J.S.A. 2C:11-3(a)(1). The State

4

moved to waive defendant to adult court pursuant to N.J.S.A. 2A:4A-26.1. The State provided a detailed statement of reasons in support of its motion, including consideration of the eleven factors enumerated in N.J.S.A. 2A:4A-26.1.

Defendant submitted a biopsychosocial assessment performed by Cecilia Alfonso, a licensed clinical social worker. The assessment describes defendant's past and was "intended to identify some of the factors that may have contributed to [his] legal situation." It noted defendant was born in El Salvador in July 1998, entered the United States illegally, and arrived in New Jersey to live with his mother in May 2013. After disobeying curfews imposed by his parents, he was locked out of the house "and began causally living with girlfriend[s] and his peers."

Defendant does not speak English. After initially earning mixed grades, defendant started failing school during tenth grade. He claimed he was subjected to threats and bullying by his schoolmates. Defendant began associating with members of MS-13 but claimed he was never a member of the gang. Alfonso noted that MS-13 maintains itself "and their members through intimidation, violence, and criminal acts." Defendant was drawn to and began socializing with known MS-13 members.

Defendant began smoking marijuana about a year after entering the United States. His usage increased to smoking six or seven joints a day. He denied using any other drugs.

Defendant complied with the rules at the juvenile detention center and was assigned to the Detail Unit for his good behavior. Combined with his grades, Alfonso found this "indicate[d] that he ha[d] the capacity to adapt his behavior and learn from his experience." She further found that, "[w]ith support, he could have been more engaged in his academics and limited his exposure to gang members."

Alfonso concluded that the following biopsychosocial factors should be considered when determining if it is appropriate to treat defendant as an adult during his criminal proceedings: (1) lack of maturity due to incomplete frontal lobe brain development; (2) loss of his nurturing extended family when he came to the United States; (3) having to maintain a low profile because mother was undocumented; (4) living in a community with a significant level of gang violence; (5) attending a school that academically underperformed; (6) being repeatedly subjected to threats, intimidation, and assaults; (7) not receiving an individualized education plan; (8) adapting well at the juvenile detention center; and (9) exhibiting academic potential.

Alfonso opined that defendant's "capacity to control impulses, ability to think of the consequences of his behavior, and skills in communicating effectively [were] not yet fully developed."

The court conducted the waiver hearing on December 22, 2016. Sergeant Ho was the State's sole witness. Defendant did not call any witnesses. The court issued a February 14, 2017 written opinion granting the State's motion for involuntary waiver of defendant to adult court. It concluded that the State: (1) "presented sufficient proofs to create a 'well-grounded suspicion or belief that the juvenile committed the alleged crime,' thereby satisfying the probable cause standard"; and (2) "did not abuse [its] discretion in seeking to waive [defendant] from the Chancery Division, Family Part, to the Law Division, Criminal Part."

As to probable cause, the court recounted Sergeant Ho's testimony and found "sufficient evidence exist[ed] to support the belief that [defendant] was the perpetrator of the alleged crime." It stated the "evidence and testimony presented indicate[d] [defendant], along with two other individuals, conspired against the victim and executed a plan to kill the victim due to the suspicion or belief that he was playing both sides between the MS-13 gang and the Eighteen Street gang." The court noted "sworn statements taken from Mr. Barraza and Mr. Delgado[] identify [defendant] as the principle actor and shooter in the

homicide of the victim." The court also noted "the victim's phone records confirm Mr. Barraza and [defendant] were in communication, shortly before and after the death of the victim."

The court rejected defendant's contention that "DNA evidence or in-court identification, [was] essential to support a finding of probable cause." It explained that "a showing of probable cause 'need not equal a prima facie case required to sustain a conviction'" and that "a probable cause finding is not a determination of guilt or innocence, but only a finding that there is sufficient evidence to proceed with [the] charges." (citations omitted).

As to defendant's claim that the prosecutor's office abused its discretion in applying for waiver, the court provided the following analysis of the State's consideration of the eleven statutory factors:

> a) <u>The nature and circumstances of the offense charged</u>
>
> The State contends that [defendant] is charged with the most serious crime in the criminal code, murder. The State further argues that [defendant] acting in concert with two other members of the MS-13 gang executed a plan to murder the victim. The State contends that [defendant] possessed a gun on the date of the homicide and shot the victim four times . . . .
>
> b) <u>Whether the offense was against a person or property, allocating more weight for crimes against the person</u>

The State argues the offense in this case was against a person, specifically causing the death of the victim . . . .

c) Degree of the [j]uvenile's culpability

The State argues that sworn statements from Mr. Delgado and Mr. Barraza indicate [defendant] as the shooter in the death of the victim. The State argues that [defendant] acted in concert with his accomplices, completed the act by shooting the victim four times after the victim was lured to the railroad track under the mistaken belief that he would be smoking marijuana with Mr. Delgado. Therefore, the State maintains that [defendant] is highly culpable . . . .

d) Age and maturity of the [j]uvenile

The State contends that [defendant] was sixteen (16) years old at the time of the homicide[] . . . [which is] one year over the statutorily required age of fifteen . . . .

e) Any classification that the juvenile is eligible for special education

The State contends that it did not receive any information from [defendant] or the [c]ourt indicating [defendant] was classified for special education.

f) Degree of criminal sophistication exhibited by the juvenile

The State argues that the level of [defendant's] criminal sophistication is illustrated by his participating in a successful gang-related scheme to commit murder. The State asserts [defendant] shot the victim four times,

9

ending the victim's life because of a gang related feud
. . . .

g) <u>Nature and extent of any prior history of delinquency of the juvenile and dispositions imposed for those adjudications</u>

The State asserts [defendant] does not have any prior history of delinquency.

h) <u>If the juvenile previously served a custodial disposition on a state facility and the response of the juvenile to the programs provided in the facility</u>

The State asserts [defendant] has not served a custodial disposition.

i) <u>Current or prior involvement of the juvenile with child welfare agencies</u>

The State contends that it did not receive any information from [defendant] or the [c]ourt indicating any involvement with child welfare agencies.

j) <u>Evidence of mental health concerns, substance abuse[,] or emotional instability of the juvenile</u>

The State considered the report of Cecilia "Cessie" Alfonso as provided by [defendant]. The State contends that the assertions regarding [defendant's] upbringing does not rise to the level of a "mental health concern." The State acknowledges that losing one's father at a young age, having a parent move to another country, and then illegally entering the United States could be dramatic. However, the State contends [defendant] was raised in an intact family.

The State rejects the notion that any emotional instability due [to] his upbringing contributed to his crime or otherwise excuses his behavior. The State argues that [defendant] does not have any adjudications for drug related offenses. The only indication of [defendant's] substance abuse is his self-report . . . .

k) If there is an identifiable victim

The State asserts that [defendant] is charged with the victim's murder. As such, the victim is unavailable to provide any input.

The court noted that the State considered the biopsychosocial assessment of defendant but contended Alfonso was not qualified to render an opinion on juvenile waiver.

The court found that the State's decision to seek waiver "was based upon consideration of all the relevant factors," did not include consideration of "any irrelevant or inappropriate factors," and "followed the guidelines prescribed by the new waiver statute." It concluded that "[t]he State's Statement of Reasons demonstrate[ed] that the decision to seek waiver was made after a reasoned, qualitative evaluation of each factor[] as they apply to [defendant]." Accordingly, the court found "the State's decision to seek waiver . . . did not amount to a clear error in judgment" since "most of the factors[] weigh[ed] heavily against [defendant] and in favor of waiver."

The court noted that: (1) defendant was sixteen years old at the time of the homicide; (2) defendant was charged with a waivable offense; (3) the offense was committed against a person, causing his death; and (4) sworn statements from Delgado and Barraza "indicate [defendant] possessed a gun on the date of the homicide and was the shooter."

In May 2017, a Union County Grand Jury returned an indictment charging defendant with: first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3 (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count four); and first-degree gang criminality, N.J.S.A. 2C:33-29(a) (count five).

In March 2018, defendant entered into a plea agreement in which he pled guilty to count one, as amended to first-degree aggravated manslaughter.[2] In exchange, the State agreed to dismiss all remaining charges and recommended a twenty-five-year sentence, subject to an eighty-five percent parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court

---

[2] An individual convicted of first-degree aggravated manslaughter "may . . . be sentenced to ordinary term of imprisonment between [ten] and [thirty] years." N.J.S.A. 2C:11-4(c).

accepted defendant's plea, finding he entered into the plea agreement "knowingly, voluntarily, and intelligently."

On May 4, 2018, the court sentenced defendant to a twenty-five-year term, subject to an eighty-five percent period of parole ineligibility and a five-year period of parole supervision upon release pursuant to NERA. The court also imposed the requisite fines and penalties and awarded defendant 1050 days of credit for time served. Defendant is subject to deportation upon release from prison.

In reaching its decision, the court rejected defendant's request to find mitigating factors three (defendant acted under strong provocation), four (substantial grounds existed tending to excuse or justify defendant's conduct), and eight (defendant's conduct resulted from circumstances unlikely to recur) but found mitigating factor seven (lack of criminal history). N.J.S.A. 2C:44-1(b)(3), (4), (7), (8). It found aggravating factors three (risk of reoffending), five (substantial likelihood defendant is involved in organized criminal activity), and nine (need for deterrence). N.J.S.A. 2C:44-1(a)(3), (5), (9). The court concluded the aggravating factors outweighed the mitigating factors.

In finding aggravating factor five, the court found that defendant was involved in organized criminal activity, noting the purpose of a "criminal street

gang, such as MS-13, is to commit crimes of atrocity and devastations, as evidenced in this case."

In applying aggravating factor nine, the court found a need for both general and specific deterrence. It stated that criminal organizations such as MS-13 "have to understand that their crimes here will be aggressively pursued by law enforcement within the means of the law, that individuals who commit such atrocities, that no expense will be avoided to apprehend those individuals and bring them to justice." The court added:

> [A] very severe penalty will be meted out, not only to dignify that suffered by the victims and the victim's' families and the victims' families community, but also of the general public, an aspect of dignity to them for the fear and misery and terror that our communities, on a daily basis, withstand because of the mayhem and violence inflicted upon it by street gangs and by individuals such as [defendant].

Finally, the court stated it considered the non-statutory factors outlined in Miller v. Alabama, 567 U.S. 460 (2012). The court noted defendant's age at the time of the crime and found "the plea in place adequately incorporate[d] those non-statutory factors," noting that if defendant were convicted at trial, his sentence "could be substantially in excess."

The court added the following comments:

Mr. Rivera, your native country of El Salvador is in utter chaos. In large measure, because of the lawless manner in which MS-13 has been able to override all conventional institutions, whether it [be] law enforcement, the judicial system, and the like.

And so there are folks, like your family, and thousands of others who come to this country looking to the very best ideal of America. And that is that America and its people will provide a new opportunity, a safer opportunity.

And your actions in this case besmirch and insult not only the ideals of America, but the incredible hard work and desperate measures that so many people undertake to somehow find themselves here. And for that, you should be ashamed.

This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE FAMILY COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO WAIVE DEFENDANT TO ADULT COURT BECAUSE THE STATE HAD FAILED TO MEET ITS EVIDENTIARY BURDEN AND ABUSED ITS DISCRETION.

(1) As the State Did Not Meet Its Evidentiary Burden, the Trial Court Erred When It Granted the State's Application for a Juvenile Waiver.

(2) The State Abused Its Discretion When It Filed an Application for a Juvenile Waiver.

15

POINT II

MR. RIVERA IS ENTITLED TO RESENTENCING AS THE TRIAL COURT FAILED TO ANALYZE AND APPLY THE MILLER/ZUBER[3] YOUTH FACTORS AND SHOWED A POLITICAL BIAS AND HOSTILITY TOWARDS HIM. (Partially Raised Below).

POINT III

TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO PROVIDE EVIDENCE IN FAVOR OF THE MILLER/ZUBER FACTORS AND MR. RIVERA'S REHABILITATION WHILE [] HE WAS DETAINED IN COUNTY JAIL FOR MORE THAN TWO YEARS. (Not Raised Below).

I.

We review a juvenile waiver determination under an abuse of discretion standard, which requires that "findings of fact be grounded in competent, reasonably credible evidence" and "correct legal principles be applied." In re State ex rel. A.D., 212 N.J. 200, 214-15 (2012) (quoting State v. R.G.D., 108 N.J. 1, 15 (1987)). We will modify the Family Part's waiver determination "only when there is a clear error of judgment that shocks the judicial conscience." Id. at 215 (quoting R.G.D., 108 N.J. at 15). However, appellate courts need not defer to trial court findings if "the trial court acts under a misconception of the

_____

[3] State v. Zuber, 227 N.J. 422 (2017).

applicable law." State in the Interest of T.M., 412 N.J. Super. 225, 231 (App. Div. 2010).

N.J.S.A. 2A:4A-26.1(c)(1) vests the State with discretion to seek a waiver of Family Part jurisdiction for certain specified offenses committed by a juvenile fifteen years of age or older. "[T]he court shall waive jurisdiction of a juvenile delinquency case" if "[t]he juvenile was [fifteen] years of age or older at the time of the alleged delinquent act," and "[t]here is probable cause to believe that the juvenile committed a delinquent act which if committed by an adult would constitute" certain enumerated crimes, including, criminal homicide and possession of a firearm for an unlawful purpose. N.J.S.A. 2A:4A-26.1(c)(1), (2)(a), (2)(j).

We affirm the Family Part's order waiving defendant to adult court substantially for the reasons expressed by Judge Candido Rodriguez, Jr. in his February 14, 2017 written opinion. We add the following comments.

Defendant contends the State did not establish probable cause for the charges because it improperly relied on hearsay and double hearsay. We disagree.

"Probable cause is a well-grounded suspicion or belief that the juvenile committed the alleged crime." State v. J.M., 182 N.J. 402, 417 (2005) (citing

State v. Moore, 181 N.J. 40, 45 (2004)).  A "trial court should find probable cause if the evidence presented and the reasonable inferences supported by that evidence give rise to a well-grounded suspicion or belief in the juvenile's guilt." A.D., 212 N.J. at 221.

A juvenile is not entitled to a favorable inference if the State failed to produce witnesses who may have knowledge of the facts.  See State in Interest of J.L.W., 236 N.J. Super. 336, 347 (App. Div. 1989).  On the contrary, "[p]robable cause may be established on the basis of hearsay evidence alone, because a probable cause hearing 'does not have the finality of trial[]' and 'need not be based solely on evidence admissible in the courtroom.'"  State in Interest of B.G., 247 N.J. Super. 403, 409 (App. Div. 1991) (citations omitted).  Sergeant Ho's testimony relating to the statements he obtained from the four MS-13 members was properly considered by the court in determining whether probable cause was established.

The State presented ample evidence to establish probable cause. Witnesses identified defendant as the shooter.  His cell phone records corroborated his involvement.  The trial court properly determined that the evidence presented at the probable cause hearing and the reasonable inferences

derived from that evidence "g[a]ve rise to a well-grounded suspicion or belief that [defendant] committed the offenses charged." A.D., 212 N.J. at 226.

Defendant also contends the State abused its discretion by failing to sufficiently consider the biopsychosocial assessment in deciding whether to seek waiver. He argues "the State failed to sufficiently consider his age and maturity; degree of criminal sophistication by the juvenile; nature and extent of any prior history of delinquency of the juvenile and dispositions imposed for those adjudications; evidence of mental health concerns, substance abuse, or emotional instability of the juvenile." We are unpersuaded.

"[A] juvenile seeking to avoid the 'norm' of waiver . . . when probable cause is found to exist, must carry a heavy burden to clearly and convincingly show that the [State] was arbitrary or committed an abuse of [its] considerable discretionary authority to compel waiver." State in re V.A., 212 N.J. 1, 29 (2012).

Notably, the biopsychosocial assessment did not diagnose defendant as suffering from any thought or mood disorders. See N.J.S.A. 2A:4A-26.1(c)(3)(j). It did not recommend evaluation by a psychiatrist or psychologist or any form of treatment. It did not opine that defendant had a low I.Q. or was classified for special education. See N.J.S.A. 2A:4A-26.1(c)(3)(e). Most

importantly, it did not conclude that his criminal acts were caused by the biopsychosocial factors that it enumerated.

Despite objecting to the Alfonso's qualifications, the prosecutor considered the assessment, as did the court. Moreover, to the extent that the assessment discusses defendant's good behavior while detained and his "capacity to adapt his behavior and learn from his experience," the amendments to the waiver statute eliminated the probability of rehabilitation as a factor to be considered. See A.D., 212 N.J. at 216; Pressler & Verniero, Current N.J. Court Rules, cmt. 4, 4.2 on R. 5:22-2 (2021).

Based on our careful review of the record, we discern no abuse of discretion warranting our intervention. Defendant did not demonstrate that the prosecutor clearly and convincingly abused her discretion in considering the statutory factors. The record fully supports the court's findings and conclusions, and we are satisfied there was no denial of justice under the law.

II.

We next address defendant's argument that he should be resentenced because the Family Part judge failed to apply the Miller/Zuber youthful offender factors and showed a political bias towards him. We disagree.

On May 4, 2018, defendant was sentenced to a twenty-five-year NERA term. He will be eligible for parole after serving eighty-five percent of that term (equating to twenty-one years and three months). Defendant was awarded 1050 days of jail credit. Consequently, he will be eligible for parole on or about September 18, 2036, when he will be only thirty-eight years old. Even if he is denied parole and maxes out, he will be only forty-one years old when released.

In State v. Bass, 457 N.J. Super. 1, 13-14 (App. Div. 2018), certif. denied, 238 N.J. 364 (2019), we held that a life sentence with a thirty-five-year parole-bar was not the functional equivalent of a life sentence, and thus, the defendant was not entitled to resentencing under Zuber, even though the sentencing court had not considered the Miller factors when it imposed his sentence. We further held that any rehabilitative actions the defendant had taken while incarcerated were matters for the parole board to consider and did not render the sentence unconstitutional. Id. at 14. In contrast to Bass, defendant was not sentenced to life and is subject to a much shorter period of parole ineligibility.

A twenty-five-year NERA term that results in a twenty-one-year and three-month parole-bar is far from a de facto life sentence when imposed on a juvenile, who will eligible for parole by age thirty-eight and must be released before his forty-second birthday. In the absence of a premature death, defendant

will have the opportunity to spend meaningful years outside of prison. Thus, he is not entitled to resentencing under Miller or Zuber.

Defendant also argues that he is entitled to resentencing because the sentencing court's "intemperate remarks" relating to his "duty as an immigrant, the present situation in El Salvador, and MS-13's alleged mandate to commit atrocities, showed bias and hostility towards him." We find no merit to this argument.

Defendant mischaracterizes most of the court's comments, which were made as part of its analysis of the aggravating factors. For example, the court commented on the "mayhem and violence inflicted upon it by street gangs and by individuals such as [defendant]" in support of aggravating factor nine (need for deterrence). The court's comments on the conditions in El Salvador and the immigrants who flee it for a better life do not show bias or hostility against defendant, his country of origin, or the people of El Salvador.

The remarks were seemingly aimed at expressing disapproval of defendant committing a gang-related homicide involving MS-13. Any apparent frustration displayed by the court related to defendant's family immigrating to the United States to make a better life and paying smugglers to bring their son here to avoid the rampant gang violence and recruitment perpetrated by MS-13

22

in San Miguel and the harassment and assaultive behavior commonly engaged by the police in that city. Despite those efforts, defendant chose to associate with members of MS-13.

Viewed in this context, the court's comments do not reflect any cultural bias or hostility toward defendant. Nor do we find that the sentencing proceeding was in any way tainted, even if the trial court's remarks might be considered inappropriate. See State v. Friedman, 209 N.J. 102, 123 (2012).

Most fundamentally, defendant was sentenced in accordance with the plea agreement. "While the sentence imposed must be a lawful one, the court's decision to impose a sentence in accordance with the plea agreement should be given great respect, since a 'presumption of reasonableness . . . attaches to criminal sentences imposed on plea bargain defendants.'" State v. S.C., 289 N.J. Super. 61, 71 (App. Div. 1996) (alteration in original) (quoting State v. Sainz, 107 N.J. 283, 294 (1987)). Thus, defendant "cannot legitimately complain that the sentence was unexpected or that he received a sentence other than that for which he explicitly negotiated." State v. Thomas, 392 N.J. Super 169, 186 (App. Div. 2007) (quoting State v. Soto, 385 N.J. Super 247, 255 (App. Div. 2006)). Moreover, defendant received a sentence significantly lower than the thirty-year maximum for aggravated manslaughter. See N.J.S.A. 2C:11-4(c).

Defendant does not challenge the court's evaluation of aggravating and mitigating factors. His sentence is not manifestly excessive or unduly punitive and does not shock the judicial conscience. Accordingly, we discern no abuse of discretion or other basis to order resentencing.

## III.

Lastly, we address defendant's argument that trial counsel was ineffective by failing to present evidence in favor of the Miller/Zuber factors and of defendant's rehabilitation while he was detained in jail before sentencing. He contends that trial counsel should have presented his biopsychosocial assessment and other evidence of his rehabilitation to the trial court.

Generally, a claim of ineffective assistance of counsel cannot be raised on direct appeal. Our Supreme Court has expressed a "general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). Only in the rare instances "when the trial itself provides an adequately developed record upon which to evaluate defendant's claims," should an appellate court consider the issue of ineffective assistance of counsel on direct appeal. State v. Castagna, 187 N.J. 293, 313

(2006). Here, there is no developed record on this issue. We therefore decline to address the ineffective assistance of counsel issue.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5487-17T4