52 A.3d 1024

STATE OF NEW JERSEY IN THE INTEREST
OF A.D., (1) A MINOR.

STATE OF NEW JERSEY IN THE INTEREST
OF A.D., (2) A MINOR.

Argued April 24, 2012—Decided September 20, 2012.

202 

*Lon C. Taylor,* Assistant Deputy Public Defender, argued the cause for appellant A.D. (1) (*Joseph E. Krakora,* Public Defender, attorney).

*Robert G. Gerage* argued the cause for appellant A.D. (2).

*Nancy A. Hulett* argued the cause for respondent State of New Jersey (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

*Lawrence S. Lustberg* argued the cause for amicus curiae American Civil Liberties Union of New Jersey Foundation (*Gibbons, Edward L. Barocas,* attorneys; *Mr. Lustberg, Mr. Barocas, Eileen M. Connor, Jeanne M. LoCicero,* and *Alexander R. Shalom,* on the brief).

Justice PATTERSON delivered the opinion of the Court.

The Court considers *N.J.S.A.* 2A:4A–26, which authorizes waiver of family court jurisdiction over the prosecution of juveniles who are fourteen years old or older for certain offenses and referral of those juveniles to adult criminal court, on motion of the prosecutor. *N.J.S.A.* 2A:4A–26(a). For all such juveniles, waiver into adult court requires a finding by the trial court, after a hearing, that "[t]here is probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult would constitute" one of a list of serious crimes set forth in the statute. *N.J.S.A.* 2A:4A–26(a)(2).

Pursuant to a 2000 amendment to *N.J.S.A.* 2A:4A–26, intended to streamline and encourage waiver of older juveniles charged with serious crimes into adult court, juveniles who are sixteen or seventeen years of age at the time of their offenses, and charged with one or more enumerated crimes, are not entitled to present evidence that the prospect of rehabilitation substantially outweighs the reasons supporting waiver. *N.J.S.A.* 2A:4A–26(e). For trial judges reviewing waiver applications with respect to these older juveniles charged with serious offenses, the probable cause finding is thus a pivotal step in the waiver application.

This case requires the Court to address the standard to be applied by Family Part judges when they determine whether the prosecution has demonstrated probable cause under *N.J.S.A.* 2A:4A–26(a)(2). It arises from a 2009 shooting in which one victim was killed and one seriously injured, allegedly by a group of men led by Angel Ramos, the father of one of the two juveniles in this case—A.D. # 1.[1] Ramos is alleged to be a leader in the Latin Kings street gang. The incident closely followed a fight in which A.D. # 1 and A.D. # 2 were beaten by an uncle of A.D. # 2 and others. According to the prosecution, the two juveniles, motivated by a desire for revenge following the fight, contacted A.D. # 1's father and participated in a conspiracy to murder A.D. # 2's uncle and others, precipitating an assault in which the targeted uncle was unhurt, but another uncle of A.D. # 2 was killed and A.D. # 2's mother was severely wounded.

The two juveniles, both approaching their eighteenth birthdays, were charged with murder, aggravated assault, conspiracy and attempted murder, among other offenses. The trial court denied the prosecution's application to waive the juveniles into adult criminal court, concluding that the State had not demonstrated probable cause under *N.J.S.A.* 2A:4A–26(a)(2). It found "no evidence" that the two juveniles had understood that their response to the fight would lead to murder. The State appealed, and an Appellate Division panel reversed the determination of the trial court, holding that the trial court had committed several legal errors in its application of the probable cause standard to the setting of this case.

We affirm the Appellate Division panel's decision. We reaffirm our holding in *State v. J.M.*, 182 *N.J.* 402, 417, 866 *A.*2d 178 (2005), that probable cause for purposes of *N.J.S.A.* 2A:4A–26 is "a well-grounded suspicion or belief that the juvenile committed the alleged crime." We further hold that the probable cause standard

---

[1] Because the two juveniles at issue in this case share the same first and last initials, they are termed "A.D. # 1" and "A.D. # 2" herein.

that governs waiver of juvenile complaints into adult criminal court under *N.J.S.A.* 2A:4A–26 is similar to the standard that guides a grand jury's determination whether or not to indict. If the trial court finds that the State has presented evidence which, combined with reasonable inferences to be drawn from that evidence, leads to a well-grounded suspicion or belief that the juvenile has committed one or more crimes enumerated in the statute, the "probable cause" standard of *N.J.S.A.* 2A:4A–26 is satisfied.

We concur with the Appellate Division panel that the trial court's finding that there was no probable cause in this case constituted error. We agree with the Appellate Division panel's conclusion that the trial court disregarded the prosecution's theory of vicarious liability, as well as crucial evidence presented in the probable cause hearing. We conclude that the evidence presented by the prosecution, combined with reasonable inferences drawn from that evidence, would give rise to a well-grounded suspicion or belief that both juveniles are criminally responsible for murder and/or aggravated assault and that both are criminally liable as accomplices to those crimes. Accordingly, we affirm the Appellate Division panel's decision reversing the trial court's orders denying waiver under *N.J.S.A.* 2A:4A–26 and remanding to the trial court for further proceedings.

## I.

The dispute at the center of this case arose in the context of a complex set of family relationships. Although A.D. # 1 is the nephew of A.D. # 2, they are only nine days apart in age.[2] A.D. # 1 lived with his mother, but maintained contact with his father, Ramos, a leader of the Latin Kings who was also known as "King Angel" and "King D." A.D. # 2 lived in a home in Woodbridge with several members of his extended family, including his par-

---

[2] On the day of the shooting, both juveniles were extremely close to reaching their majority. A.D. # 1 turned eighteen ten days later and A.D. # 2 turned eighteen the day after the incident.

ents, his grandparents, several young children and his maternal uncle, Luis Vasquez. Another uncle, Angel Vasquez, and an aunt, Beatrice Rodriguez, lived nearby.

The evidence considered by the trial court at the probable cause hearing consisted primarily of statements given to police by A.D. # 2, his relatives and friends in the immediate aftermath of the shooting.[3] Those statements focused upon three events of August 18, 2009: a fight that evening involving the two juveniles, A.D. # 2's uncle Luis and others; the juveniles' call to and communication with A.D. # 1's father, Ramos; and the shooting itself later that evening. We review that evidence, some of it contradictory, in detail.

Although A.D. # 2 and his uncle Luis shared a house, they had a contentious relationship. According to A.D. # 2, their August 18, 2009 dispute was triggered by the behavior of Angel Alvarado, a cousin of A.D. # 2's uncle Luis, whom A.D. # 2 believed had exposed himself to A.D. # 2's mother. In another interview, A.D. # 2 said the dispute occurred because Luis "hit my mom [ ] and my father."

Whatever the source of the animosity between A.D. # 2 and his uncle Luis, their dispute escalated into violence on August 18, 2009. According to A.D. # 2's statement to police, that afternoon, A.D. # 2 went to his home in Woodbridge with his nephew, Ricardo Soto, and an unidentified friend. In two inconsistent accounts, A.D. # 2 explained he went to the house either to retrieve a video game or to challenge Alvarado. At the house, the three encountered Alvarado, and confronted him about his alleged conduct toward A.D. # 2's mother. Luis joined the group as they were arguing. According to A.D. # 2, Luis baited Soto, and the

---

[3] A.D. # 2 gave the police four statements, the latter three of which followed the administration of warnings pursuant to *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), and two of which were given in the presence of his father. A.D. # 2's statements contradicted one another in material respects. The police questioned A.D. # 1 but he provided no substantive information.

argument turned into a shoving match. Observing Luis reach into his "toolbox," and concerned that there might be a weapon, A.D. #2 and his two companions left the house. Luis provided a different account; he recalled that A.D. #2 came to the house in Woodbridge with two friends and confronted him, but left after he told them that he would not tolerate a fight at his mother's house. A.D. #2 responded that he and the others would be back, and left by car.

During the early evening, A.D. #2 returned to the Woodbridge house in a green Honda, now accompanied by his two nephews, Soto and A.D. #1, along with Gary Perry. Although A.D. #2 told police that the purpose of his second visit was to collect the video game, Perry stated that the group went to the house in Woodbridge in order to fight with Luis. Perry recalled that A.D. #2 urged A.D. #1 and Perry to attack Luis, and that although A.D. #1 did not know Luis, he wanted to fight with Luis because he heard that Luis had punched A.D. #2's father.

Before they reached the house, the group encountered Luis and a large group of men—"thirty of them whatever" according to Soto, but eight or nine according to A.D. #2—who immediately challenged them. A.D. #2 told police that Luis and his supporters gave Soto a black eye. Perry recalled that Luis ran to A.D. #1 and "started beating up on" him, and that A.D. #1 tripped and fell with Luis "on top of him smacking him, smacking him." Perry also recalled A.D. #2's anger at his uncle that evening: "I guess for the moment of [A.D. #2] being mad of what's going on he said that he was gonna kill [Luis] but, um, people say things like that." A.D. #2, A.D. #1 and their friends swiftly lost their fight with the larger group of adult men, led by A.D. #2's uncle Luis.

What happened next is disputed among the witnesses whose statements were considered at the probable cause hearing. A.D. #2 denied threatening Luis or his supporters. However, Beatrice Rodriguez told police that A.D. #2 threatened that Ramos would avenge his son A.D. #1's beating. According to Rodriguez, A.D.

# 2 said "you know, um, you did wrong, you hit one of the Latin Kings kids, this is not over." Alvarado told police that A.D. # 2 said "nah you just f* * *ed up right there," and when Alvarado asked "what you mean," A.D. # 2 said "you just hit a King's son, you just hit King Angel's son ... we'll be back." Luis told police that A.D. # 2 said that someone had "hit the kid ... the father's a King." Perry confirmed that he heard A.D. # 2 say that the group had fought with the wrong people because A.D. # 1's father was a Latin King.

After losing their battle with Luis and his group of supporters, the two juveniles contacted A.D. # 1's father Ramos. As telephone records confirm, A.D. # 1 borrowed A.D. # 2's cell phone and called Ramos at 8:50 p.m., immediately after he was injured in the fight with the older men. According to A.D. # 2, A.D. # 1 "called his dad cause, cause a little boy who you look up to." Perry, who was standing with A.D. # 1 and the others during the telephone conversation, recalled that A.D. # 1 "told his dad just basically that we went to the house to get the [video] game and we got jumped and from there his dad said, I guess his dad said alright, he's coming."

Telephone records indicate that immediately after hearing from his son, Ramos made a series of telephone calls to others, and redialed his son on A.D. # 2's cell phone at 8:55 p.m. At this point, it was raining heavily, but A.D. # 1, A.D. # 2, Soto and Perry waited outside for Ramos to arrive for a period estimated by different witnesses to have been fifteen to thirty minutes. According to A.D. # 2, Ramos then arrived in a white Honda joined by other men in the Honda and in an accompanying black SUV with tinted windows. A.D. # 2 reported that Ramos stood on the street staring at the house where A.D. # 2, his uncle Luis and other family members lived.

Witnesses gave conflicting accounts of the events immediately following Ramos' arrival on the scene. A.D. # 2 said that he tried to leave, but Ramos ordered him to "get your ass in the car." A.D. # 2 thought that the man in the front passenger seat was

armed because of the way that he held his hand to his waist, and noted it was "weird with four people wearing things to cover their face." He said that when he entered the car he heard Ramos and the other men discussing the fact that Ramos' "little dude" had been beaten. According to A.D. # 2, A.D. # 1 tried to calm his father. A.D. # 2 reported, "this is honest, [A.D. # 1] was telling his dad, yo, don't do this, like don't, cause he knows what his dad is capable of. He knows a lot what his dad was capable of." A.D. # 2 told police that A.D. # 1 "had that face, like dam[n], I didn't even want it to be like that. He even said it, he was like I should have never call my dad. And he, he's right, he should of never called his dad."

Soto's testimony contradicts A.D. # 2's contention that the juveniles were within Ramos' control. He told police that although he and Perry were also ordered into the car, they declined and left for Soto's house. Soto disputed A.D. # 2's statement that A.D. # 2 was forced into Ramos' car. At different stages of his statement to police, Soto said that as he and Perry were leaving, they saw A.D. # 2 walking with his father, Bienvenido, back to their house, but also that he saw A.D. # 2 in Ramos' car. Soto recalled that A.D. # 2 later called him and asked to meet at the location where they had last been together, but when Soto and Perry returned for A.D. # 2 they could not find him.

The white Honda carrying Ramos and the black SUV were then driven the short distance to A.D. # 2's home in Woodbridge. According to A.D. # 2's statement, Ramos told A.D. # 2 to go into the house, to take his parents to the basement, and to "tell your uncle [Luis] to come out here." Beatrice Rodriguez, in the house at the time of the shooting with her husband, Angel Vasquez, recalled A.D. # 2 "rushing" his parents into the house and saying that "whoever's the leader" should "go outside." Luis responded, "leader of what," and asked Angel Vasquez, who would be killed moments later, "what the hell is this guy talking about?" Luis, his girlfriend and Angel Alvarado sought refuge on the second floor of the house, and survived the shooting.

According to the statements admitted at the probable cause hearing, Angel Vasquez and his wife, Rodriguez, with A.D. # 2 and his parents, remained on the first floor, with A.D. # 2 imploring his parents to get to safety. Rodriguez stepped outside the house, and was slapped by one of the men who had accompanied Ramos. Rodriguez told police that the man who slapped her broke the storm door with a baseball bat, while another man tried to break the door down. Rodriguez ran for cover behind a parked car. In a statement possibly referring to A.D. # 1, she told police that she saw "the little boy with the gray tank top," whom she identified as a teenage friend of A.D. # 2, outside the house with the other men during the shooting.

The evidence admitted at the probable cause hearing showed that six shots were fired through the door by an unidentified member of the group. Vasquez was shot once in the chest, and died. A.D. # 2's mother, Lourdes, was shot several times and critically injured, with wounds in the leg, arm and chest. Despite her injuries, she survived.

## II.

After police officers completed their investigation, A.D. # 1 and A.D. # 2 were charged with acts of delinquency which, if committed by an adult, would constitute murder, *N.J.S.A.* 2C:11–3, conspiracy to commit murder, *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:11–3, attempted murder, *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3, aggravated assault, *N.J.S.A.* 2C:12–1b(1), possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39–4a, possession of a handgun without a permit, *N.J.S.A.* 2C:39–5b, hindering one's own apprehension, *N.J.S.A.* 2C:29–3b, and hindering the apprehension of another, *N.J.S.A.* 2C:29–3a(7).

The murder and aggravated assault offenses with which the juveniles were charged are among the offenses set forth in *N.J.S.A.* 2A:4A–26(a)(2)(a), and accordingly, *N.J.S.A.* 2A:4A–26 authorized the State to ask the trial court to waive Family Part jurisdiction over both juveniles based upon a showing of probable

cause. *N.J.S.A.* 2A:4A–26(a), (e). The State filed a waiver application, and the trial judge held a probable cause hearing on January 22, 2010. The court heard the testimony of Investigator Paul Miller of the Middlesex County Prosecutor's Office, who was the primary investigator on the case. The State presented evidence including Investigator Miller's report, the report of the autopsy of Angel Vasquez, the medical records of Lourdes, maps, photographs, cell phone records and witness statements given by A.D. # 2, Luis and Rodriguez.

On March 10, 2010, the trial court issued an oral opinion holding that the State had failed to demonstrate probable cause. Accordingly, it denied the State's application to waive Family Part jurisdiction over the juveniles under *N.J.S.A.* 2A:4A–26. The State filed motions for leave to appeal with respect to both juveniles, which the Appellate Division granted and consolidated. The Appellate Division panel also granted the State's application to expand the record to include a written opinion issued by the trial judge in another case in which the judge expressed his disagreement with the Legislature's approach to juvenile waiver in *N.J.S.A.* 2A:4A–26.[4]

The panel reversed the trial court's decision, holding that although the trial judge correctly stated the legal principles guiding the waiver decision, he "strayed from these core principles and disregarded the State's theory of the case." *State in the Interest of A.D. (Two Cases)*, 420 *N.J.Super.* 144, 156, 19 *A.*3d 482 (App. Div.2011). The panel identified three errors in the trial court's analysis: its failure to address the State's contention that the juveniles were vicariously liable for reasonably foreseeable consequences of a plan to which they agreed; its disregard of a statement by A.D. # 2 that Ramos was armed; and the weight given by the trial court to the juveniles' defenses of renunciation and duress. *Id.* at 156–57, 19 *A.*3d 482. The Appellate Division

---

[4] The Appellate Division panel reserved decision on the State's motion to further supplement the record with other statements by the same judge regarding juvenile waiver, and denied that motion as moot after deciding the appeal.

panel remanded the case to the trial court for further proceedings.[5]

A.D. # 1 filed a motion for leave to appeal in this Court, which was granted. 210 *N.J.* 118, 41 *A.*3d 738 (2011). A.D. # 2 then filed a motion for leave to appeal in this Court, which we granted notwithstanding the fact that it was untimely. *Ibid.* The American Civil Liberties Union of New Jersey Foundation (ACLU) was granted leave to participate in this appeal as amicus curiae.

### III.

In a brief filed by A.D. # 1 and adopted by A.D. # 2, the juveniles contend that the probable cause hearing should function as a "firewall" between the broadened prosecutorial discretion permitted by *N.J.S.A.* 2A:4A–26 and "the independence of the judiciary." The juveniles argue that while the State is entitled to reasonable inferences from the evidence presented at the probable cause hearing, it is not entitled to "favorable inferences," because such inferences would reduce the probable cause hearing to "a waste of time."

The juveniles urge the Court to afford broad deference to the trial court's determination that there was no probable cause in this case. They argue that there is no evidence that they participated in a conspiracy, and that even if there were such a conspiracy, they are not criminally liable for the shootings that took place in this case because those crimes were not foreseeable. The juve-

---

[5] After the case was remanded, according to the State, it orally requested that the trial judge recuse himself. The trial judge twice refused to do so, on the grounds that no formal recusal motion had been presented. The trial judge also determined that the decision to seek waiver in this case constituted a patent and gross abuse of discretion, by clear and convincing evidence, but concluded that by virtue of the Appellate Division's decision, he was constrained to sign orders transferring the complaints against both juveniles to adult criminal court. The State appealed that ruling. This Court recently held that the appropriate standard for a trial court to apply in reviewing prosecutorial decisions to seek waiver under *N.J.S.A.* 2A:4A–26 is abuse of discretion, not patent and gross abuse of discretion. *State in the Interest of V.A.*, 212 *N.J.* 1, 24–25, 50 *A.*3d 610 (2012).

niles contrast the circumstances here from the setting of *State v. Bridges*, 133 *N.J.* 447, 628 *A.*2d 270 (1993), on the ground that the consequences of the "uncharged and vague conspiracy to retaliate" were not objectively foreseeable or reasonably anticipated. Finally, the juveniles cite a popular periodical to argue that the adolescent brain is not fully developed, and that the Court should consider the mens rea for purposes of determining juvenile co-conspirator vicarious liability in that context.

The State counters that the trial judge harbored a "stated aversion, both verbal and written, to the juvenile waiver statute," documented in his statements in several cases, and that the trial court's decision is accordingly not entitled to deference. It argues that the Appellate Division was correct to find probable cause based upon reasonable inferences from the State's uncontested evidence presented at the probable cause hearing. Given the lack of defense evidence, the State argues that the trial court should not have drawn inferences in favor of the juveniles, and that the Appellate Division "properly righted the scale" when it premised its decision upon inferences in favor of the prosecution.

The ACLU argues that the criminal justice system's special consideration for juveniles is premised upon overwhelming scientific evidence that the brains of young people are not fully developed, and that juveniles are less capable than adults of anticipating the consequences of their actions. It further contends that the probable cause determination under *N.J.S.A.* 2A:4A–26 should entail a finding of probable cause with respect to each element of each offense, and that the inquiry should be particularly probing when a juvenile is charged with conspiracy. The ACLU argues that the Appellate Division based its determination on inferences favorable to the State, rather than all reasonable inferences, and that there was no basis for a finding of probable cause.

## IV.

We consider the trial court's decision under the standard of appellate review of juvenile waiver determinations set forth in *State v. R.G.D.*, in which the Court required that

1) findings of fact be grounded in competent, reasonably credible evidence, 2) correct legal principles be applied, and 3) the judicial power to modify a trial court's exercise of discretion will be applied only when there is a clear error of judgment that shocks the judicial conscience.

[108 *N.J.* 1, 15, 527 *A.*2d 834 (1987).]

*See also State in the Interest of T.M.,* 412 *N.J.Super.* 225, 231, 989 *A.*2d 302 (App.Div.2010) (appellate court need not defer to trial court's findings in waiver context if "the trial court acts under a misconception of the applicable law"); *State v. Onque,* 290 *N.J.Super.* 578, 584, 676 *A.*2d 560 (App.Div.), *certif. denied,* 146 *N.J.* 497, 683 *A.*2d 200 (1996). Thus, if we determine that the trial court has erroneously applied the governing principles of law, its determination should be reversed.

 The juvenile waiver hearing is a " 'critically important action determining vitally important statutory rights of the juvenile' charged with a criminal offense." *J.M., supra,* 182 *N.J.* at 410, 866 *A.*2d 178 (quoting *Kent v. United States,* 383 *U.S.* 541, 556, 86 *S.Ct.* 1045, 1055, 16 *L.Ed.*2d 84, 94 (1966)); *see also State in the Interest of V.A.,* 212 *N.J.* 1, 8, 50 *A.*3d 610 (2012) (recognizing "serious consequences for the juvenile who is waived up to adult proceedings"). "[O]nce waiver occurs, the juvenile 'loses all the protective and rehabilitative possibilities available to the Family Part.' " *J.M., supra,* 182 *N.J.* at 415, 866 *A.*2d 178 (quoting *R.G.D., supra,* 108 *N.J.* at 5, 527 *A.*2d 834). Waiving a juvenile to adult court is thus "the single most serious act that the juvenile court can perform." *R.G.D., supra,* 108 *N.J.* at 4, 527 *A.*2d 834 (quotation and citation omitted).[6]

---

[6] Citing *Graham v. Florida,* —— *U.S.* ——, 130 *S.Ct.* 2011, 176 *L.Ed.*2d 825 (2010) and *Roper v. Simmons,* 543 *U.S.* 551, 125 *S.Ct.* 1183, 161 *L.Ed.*2d 1 (2005), the ACLU argues that by virtue of their incompletely developed personalities and limited ability to make responsible choices, juveniles are better served if they remain in the juvenile justice system and are not waived into adult criminal court. *Graham* and *Roper* examine, respectively, the imposition of life without parole and execution of individuals who committed crimes as juveniles in the context of the Eighth Amendment's prohibition on cruel and unusual punishment, which is not an issue in this case. To the extent that the ACLU contends that the broadened waiver authorized by the 2000 amendments to *N.J.S.A.*

■ As amended, the statute creates a special category of juveniles aged sixteen or seventeen who are accused of one of the serious crimes enumerated by *N.J.S.A.* 2A:4A–26(e). The enumerated crimes include, among others, those specified in *N.J.S.A.* 2A:4A–26(a)(2)(a). *Ibid.* Thus, the enumerated crimes include:

> [c]riminal homicide other than death by auto, strict liability for drug induced deaths, pursuant to *N.J.S.* 2C:35–9, robbery which would constitute a crime of the first degree, carjacking, aggravated sexual assault, sexual assault, aggravated assault which would constitute a crime of the second degree, kidnapping, aggravated arson, or gang criminality pursuant to section 1 of P.L.2007, c. 341 (C.2C:33–29) where the underlying crime is enumerated in this subparagraph or promotion of organized street crime pursuant to section 2 of P.L.2007, c. 341 (C.2C:33–30), which would constitute a crime of the first or second degree which is enumerated in this subparagraph.
>
> [*N.J.S.A.* 2A:4A–26(a)(2)(a).]

For older juveniles accused of one or more serious crimes including those identified in *N.J.S.A.* 2A:4A–26(a)(2)(a), the probable cause determination is particularly crucial. As amended in 2000, the statute eliminated such an older juvenile's right to forestall waiver by showing "that the probability of his rehabilitation by the use of the procedures, services and facilities available to the court prior to the juvenile reaching the age of 19 substantially outweighs the reasons for waiver." *N.J.S.A.* 2A:4A–26(e); *see also R.* 5:22–2(c)(3).[7] Accordingly, for juveniles sixteen or older, "once the State has established probable cause that a juvenile committed an act equivalent to an enumerated offense, waiver is required and the juvenile is denied the opportunity to present rehabilitation evidence." *V.A., supra,* 212 *N.J.* at 10, 50 *A.*3d 610. The waiver determination is subject to procedural protections; the juvenile is permitted to present evidence and testify on his or her own behalf.

---

2A:4A–26 does not represent sound public policy, that argument addresses an issue that is within the province of the Legislature.

[7] For all juveniles fourteen or fifteen years of age, and for sixteen- and seventeen-year-old juveniles charged with offenses other than those enumerated by 2A:4A–26(e), the trial court considers the prospect of rehabilitation. The waiver standards to be applied to each category of juveniles are set forth in *Rule* 5:22–2(c).

*J.M., supra,* 182 *N.J.* at 416, 866 *A.*2d 178; *see also R.* 5:22–2(b) (providing that court shall receive evidence offered by juvenile and permit cross-examination at probable cause hearings).

## V.

■ In its original and amended versions of *N.J.S.A.* 2A:4A–26, the Legislature did not precisely define the standard of probable cause for purposes of juvenile waiver. *N.J.S.A.* 2A:4A–26. However, the Legislature has given the Court general guidance, directing that the terms used in its statutes "shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language." *N.J.S.A.* 1:1–1. Our task is to determine the meaning and intent of the Legislature, guided by the Legislature's plain language. *State v. Gandhi,* 201 *N.J.* 161, 176, 989 *A.*2d 256 (2010); *State v. Smith,* 197 *N.J.* 325, 332, 963 *A.*2d 281 (2009); *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). Accordingly, we review the meaning of the term "probable cause" in other important settings in our criminal justice system.

In the search and seizure context, the existence of probable cause for an arrest or a search warrant is a fact-sensitive inquiry that cannot be simply defined. As we held in *State v. Chippero,* probable cause for the issuance of an arrest warrant " 'eludes precise definition.' " 201 *N.J.* 14, 26, 987 *A.*2d 555 (2009) (quoting *State v. Sullivan,* 169 *N.J.* 204, 210, 777 *A.*2d 60 (2001)). Courts considering the issuance of a warrant are cautioned to "consider the totality of the circumstances when assessing the reasonable probabilities that flow from the evidence submitted in support of a warrant application." *Id.* at 27, 987 *A.*2d 555 (citing *Schneider v. Simonini,* 163 *N.J.* 336, 361, 749 *A.*2d 336 (2000)). As this Court held in *State v. Burnett,* reviewing a trial court's determination of a motion to suppress, "[p]robable cause is said to be a reasonable basis for the 'belief' that a crime has been or is being committed.

The quality of that belief is not precisely defined in our cases. We know it is something more than a raw suspicion but something less than a finding of guilt." 42 *N.J.* 377, 386, 201 *A.2d* 39 (1964); *see also State v. Waltz*, 61 *N.J.* 83, 87, 293 *A.2d* 167 (1972) (probable cause in motion to suppress "not a technical concept but rather one having to do with the factual and practical considerations of everyday life upon which reasonable men, not constitutional lawyers, act") (quotation omitted); Byrnes, *Current N.J. Arrest, Search & Seizure* § 5:2–2, at 77–78 (2012).

Probable cause is also the governing standard in hearings conducted pursuant to *Rule* 3:4–3 to determine whether to bind the defendant over to await a grand jury determination. *Rule* 3:4–3 provides that "[i]f, from the evidence, it appears to the court that there is probable cause to believe that an offense has been committed and the defendant has committed it, the court shall forthwith bind the defendant over to await final determination of the cause; otherwise, the court shall discharge the defendant from custody if the defendant is detained." [8] In contrast to the due process protections afforded in the juvenile setting, adult defendants have no right to present evidence at a hearing under *Rule* 3:4–3, although they may cross-examine the State's witnesses. *R.* 3:4–3(a); *J.M., supra*, 182 *N.J.* at 413, 866 *A.2d* 178.

 Although it is more often described as an inquiry as to whether the State has set forth a prima facie case that a crime has been committed and that the accused has committed it, the standard governing a grand jury's decision whether to indict has also been characterized as one of probable cause. *See State v. Hogan*, 144 *N.J.* 216, 227, 237, 676 *A.2d* 533 (1996); *see also State v. Simon*, 421 *N.J.Super.* 547, 555–56, 25 *A.3d* 1133 (App.Div.2011)

---

[8] A finding of no probable cause at a *Rule* 3:4–3 hearing for a certain crime "does not bar later prosecution for that crime." Pressler & Verniero, *Current N.J. Court Rules*, comment on *R.* 3:4–3 (2012); *see also State v. Farrad*, 164 *N.J.* 247, 268, 753 *A.2d* 648 (2000) (citing *R.* 3:4–3(a)); *State v. Smith*, 32 *N.J.* 501, 537, 161 *A.2d* 520 (1960), *cert. denied*, 364 *U.S.* 936, 81 *S.Ct.* 383, 5 *L.Ed.2d* 367 (1961).

("[N]o one can be required to stand trial for a criminal offense unless a grand jury finds probable cause of an accused's guilt and issues an indictment."). In that context, grand jurors are instructed to consider both the evidence presented by the State and the "reasonable inferences" from that evidence:

> You may act only on the basis of the evidence you receive. You are not to return an indictment unless the State has presented evidence which together with the reasonable inferences you draw from that evidence, leads you to conclude that (1) a crime has been committed and (2) the accused has committed it. Furthermore, when determining whether to return an indictment, you should not consider the potential punishment in the event of a conviction.
>
> The Grand Jury must ensure that no person is subjected to a criminal charge unless there is an adequate basis for it. It is only when you have received such evidence that an indictment may be returned.
>
> [Standard Grand Jury Charge (Promulgated by Directive # 6–06), at 2 (April 25, 2006).] [9]

Judicial review of a grand jury's application of this instruction involves evaluation of "the evidence and the rational inferences drawn from that evidence in the light most favorable to the State" to determine whether "a grand jury could reasonably believe that a crime occurred and that the defendant committed it." *State v. Morrison*, 188 *N.J.* 2, 13, 902 *A.2d* 860 (2006); *see also State v. N.J. Trade Waste Ass'n*, 96 *N.J.* 8, 27, 472 *A.2d* 1050 (1984) ("In determining the sufficiency of the evidence to sustain the indictment, every reasonable inference is to be given to the State."). Thus, while a court reviewing the sufficiency of evidence before a grand jury considers only reasonable inferences from the State's evidence, it views the evidence and the reasonable inferences that can be drawn from them from the perspective most favorable to the State.

█ In the grand jury setting, our law sharply distinguishes between evidence sufficient to support an indictment and the evidence necessary to establish guilt beyond a reasonable doubt.

---

[9] "An inference is a deduction which may or may not be made from certain proven facts." *State v. Corby*, 28 *N.J.* 106, 114, 145 *A.2d* 289 (1958). It is defined as "[a] conclusion reached by considering other facts and deducing a logical consequence from them." *Black's Law Dictionary* 793 (8th ed. 2004).

At the indictment stage, the State need not present evidence necessary to sustain a conviction, but only a showing sufficient for the grand jury to "determine that there is *prima facie* evidence to establish that a crime has been committed." *N.J. Trade Waste Ass'n, supra,* 96 *N.J.* at 27, 472 *A.*2d 1050; *see also State v. Fleischman,* 383 *N.J.Super.* 396, 399, 891 *A.*2d 1247 (App.Div. 2006), *aff'd,* 189 *N.J.* 539, 917 *A.*2d 722 (2007); *State v. Graham,* 284 *N.J.Super.* 413, 416–17, 665 *A.*2d 769 (App.Div.1995), *certif. denied,* 144 *N.J.* 378, 676 *A.*2d 1092 (1996).

 Given that the grand jury does not determine guilt or innocence, the State need not present evidence in favor of the defendant unless it directly negates guilt and is clearly exculpatory. *Hogan, supra,* 144 *N.J.* at 236–37, 676 *A.*2d 533. A defense need not be charged to a grand jury unless it is an "exculpatory defense," defined as "one that would, if believed, result in a finding of no criminal liability, *i.e.,* a complete exoneration." *State v. Hogan,* 336 *N.J.Super.* 319, 341, 764 *A.*2d 1012 (App.Div.), *certif. denied,* 167 *N.J.* 635, 772 *A.*2d 937 (2001). The grand jury thus limits its inquiry, sometimes called a determination of probable cause, to the threshold question of whether there is a prima facie showing, considering the evidence and the reasonable inferences that can be derived from it, subject to judicial review of the evidence in the light most favorable to the State.

 The trial court's task in a probable cause hearing under *N.J.S.A.* 2A:4A–26 is a similar inquiry. We reaffirm our holding in *J.M.* that probable cause for purposes of *N.J.S.A.* 2A:4A–26 is "a well-grounded suspicion or belief that the juvenile committed the alleged crime." *J.M., supra,* 182 *N.J.* at 417, 866 *A.*2d 178 (citing *State v. Moore,* 181 *N.J.* 40, 45, 853 *A.*2d 903 (2004)). "[T]he suspicion of guilt must be something more than a raw, unsupported suspicion, [but] it may be something less than the proof needed to convict." *State in the Interest of B.G.,* 247 *N.J.Super.* 403, 409, 589 *A.*2d 637 (App.Div.1991) (quotations omitted). The inquiry " 'does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponder-

ance standard demands, and credibility determinations [will] seldom [be] crucial in deciding whether the evidence supports a reasonable belief in guilt.' " *J.M., supra,* 182 *N.J.* at 417, 866 *A.*2d 178 (quoting *Gerstein v. Pugh,* 420 *U.S.* 103, 122, 95 *S.Ct.* 854, 867, 43 *L.Ed.*2d 54, 69 (1975)). Thus, rather than invoking a factual dispute in the record to deny waiver under *N.J.S.A.* 2A:4A–26, the trial court should find probable cause if the evidence presented and the reasonable inferences supported by that evidence give rise to a well-grounded suspicion or belief in the juvenile's guilt.

## VI.

Central to the probable cause inquiry are the elements of the crimes enumerated by *N.J.S.A.* 2A:4A–26(e) that were charged in this case. Both juveniles are accused of two enumerated crimes: the murder of Angel Vasquez, as well as the aggravated assault of A.D. # 2's mother Lourdes. When a person "purposely causes death or serious bodily injury resulting in death;" or "knowingly causes death or serious bodily injury resulting in death," he or she is guilty of murder. *N.J.S.A.* 2C:11–3(a). An individual is guilty of aggravated assault when he or she "[a]ttempts to cause serious bodily injury to another, or causes such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury." *N.J.S.A.* 2C:12–1(b)(1).

To prove the murder and aggravated assault charges against the juveniles, the State relies on a theory of accomplice liability. A defendant is responsible as an accomplice for a crime committed by another if he or she, intending to facilitate the crime, either solicits the other person to commit it, aids the person committing it, or does not prevent the crime, notwithstanding the fact that he or she has an obligation to do so. *N.J.S.A.* 2C:2–6(b)(3); *N.J.S.A.* 2C:2–6(c)(1). To be convicted of accomplice liability, the defendant must "share the same intent required to be proven against the person who actually committed the act." *State v. Weeks,* 107 *N.J.* 396, 405, 526 *A.*2d 1077 (1987) (quotation

omitted). We have also observed that "[o]n the other hand, an accomplice who does not share the same intent or purpose as the principal may be guilty of a lesser or different crime than the principal." *State v. Whitaker*, 200 *N.J.* 444, 458, 983 *A.*2d 181 (2009).

The State also pursues a theory of vicarious liability in the form of co-conspirator liability for the murder charge. Conspiracy to commit an offense is considered to be a lesser-included offense of the substantive criminal offense, in this case murder. *N.J.S.A.* 2C:1–8(d)(2); *see also State v. Madden*, 61 *N.J.* 377, 393–94, 294 *A.*2d 609 (1972); *State v. Mance*, 300 *N.J.Super.* 37, 63–64, 691 *A.*2d 1369 (App.Div.1997). The State must demonstrate that each juvenile conspired to commit the murder of Luis, which requires a finding that either he agreed with another person or persons that one or more of them would engage in the murder or an attempt or solicitation of the crime, or that he agreed to aid such other person or persons in the planning or commission of the murder or of an attempt or solicitation to commit the crime. *See N.J.S.A.* 2C:5–2(a). We have noted that "the major basis of conspiratorial liability [is] the unequivocal evidence of a firm purpose to commit a crime that is provided by the agreement.... Actual commission of the crime is not a prerequisite to conspirator liability.... It is the agreement that is pivotal." *State v. Samuels*, 189 *N.J.* 236, 245–46, 914 *A.*2d 1250 (2007) (quotations and citations omitted). A conspirator can be held responsible for the acts of his or her co-conspirators even if the acts are not within the scope of the conspiracy, if they are "reasonably foreseeable as the necessary or natural consequence of the conspiracy." *Bridges, supra*, 133 *N.J.* at 466–67, 628 *A.*2d 270; *see also N.J.S.A.* 2C:5–2.

Our Criminal Code recognizes the doctrine of transferred intent, imposing liability for the death or injury to a particular victim or for a more serious harm than the actor "designed, contemplated or risked" if the "only difference between what actually occurred and what was designed, contemplated or risked is that a different person or property was injured or affected or that a less serious

or less extensive injury or harm occurred." *N.J.S.A.* 2C:2–3(d). However,

> [w]hen the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation, as the case may be, of the actor, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense.
>
> [*N.J.S.A.* 2C:2–3(b).]

The law of transferred intent is potentially relevant given the death of one victim, and the serious injury of another, neither of whom may have been the primary target of the August 17, 2009 shootings.

## VII.

In that setting, we review the trial court's interpretation of the evidence presented at the hearing on January 22, 2010, and its determination that the State had failed to demonstrate probable cause. In its oral opinion dated March 10, 2010, the trial court correctly characterized the probable cause standard as "a well grounded suspicion or belief that a[n] offense has taken place and the juvenile was party to it." The trial court noted its obligation to "take all reasonable inferences for the State." It acknowledged the scope of the evidence presented by the State.

The trial court held, however, that the evidence did not establish an agreement between A.D. # 1, A.D. # 2 and Ramos to commit murder, and that "the most that the juveniles would have been responsible for was, I do believe that there was an assault anticipated." It concluded that prior to the shooting at the Woodbridge home, A.D. # 1 renounced his decision to involve his father and "was not a party to . . . this particular incident," and that by virtue of this renunciation A.D. # 1 was not responsible for the crime. The trial court further concluded that A.D. # 2 "really didn't, really comprehend what was about to transpire," and that A.D. # 2 would not have participated in a conspiracy that would harm his mother. It held that while "initially" A.D. # 1 and A.D.

# 2 had been interested in "getting some retaliation ... there's no evidence that they ever anticipated it would escalate to murder."

We concur with the Appellate Division panel that the trial court's decision was premised upon material legal errors. On the substantial evidence before it and reasonable inferences based upon that evidence, there was more than sufficient basis to find "a well-grounded suspicion or belief that the juvenile committed the alleged crime" under *N.J.S.A.* 2A:4A–26. *J.M., supra,* 182 *N.J.* at 417, 866 *A.*2d 178. Among other evidence, the record contains several witness statements that could, if accepted by a factfinder, establish that A.D. # 2 threatened his uncle Luis and his supporters with violent revenge, for what he considered their audacity in beating the son of a Latin King. The record also reflects that immediately after losing their street fight, both juveniles took immediate steps to involve Ramos in their dispute with Luis and the others; A.D. # 1 used A.D. # 2's cell phone to tell Ramos that they had been beaten. Based upon the telephone call itself, and the expected arrival of Ramos and the others, there is ample foundation for a well-grounded suspicion that both juveniles knew that A.D. # 1's father planned immediate retribution. Yet instead of dispersing to defuse a potentially violent situation, both juveniles waited in the pouring rain for the arrival of Ramos and other men.

Although the precise sequence of events that followed is disputed, the record contains evidence from which a factfinder could infer that these juveniles sought not only to prompt violent revenge by A.D. # 1's father, but to be present to participate in or witness it. The evidence suggests that Ramos needed the assistance of both juveniles in order to identify the individuals who had beaten A.D. # 1, establish their whereabouts, and put "the leader" Luis in a location in which he could be killed. Witness testimony supports the State's contention that A.D. # 1 and A.D. # 2 remained with Ramos, followed his instructions, and guided him to his target. A.D. # 2's cooperation with Ramos, according to some witnesses, included his attempt to persuade Luis to go outside, at

a moment when A.D. # 2 had ample reason to anticipate that Luis and others would be the targets of an imminent attack. The shootings of Angel Vasquez and Lourdes may not have been intended by A.D. # 2 or A.D. # 1, but there is ample basis for a well-grounded suspicion that they were the reasonably foreseeable consequences of the chain of events that the juveniles purposefully set in motion. *Bridges, supra,* 133 *N.J.* at 468, 628 *A.*2d 270; *see also N.J.S.A.* 2C:2–3; *N.J.S.A.* 2C:2–6; *N.J.S.A.* 2C:5–2; *State v. Taccetta,* 301 *N.J.Super.* 227, 243, 693 *A.*2d 1229 (App.Div.), *certif. denied,* 152 *N.J.* 188, 704 *A.*2d 18 (1997).

We hold that the trial court's determination that the State had failed to demonstrate probable cause was premised upon errors of law. The trial court disregarded almost all of the evidence presented by the State at the probable cause hearing. It made a finding that neither juvenile "knew about the weapon" that directly contradicted A.D. # 2's statement. As noted by the Appellate Division panel, the trial court ignored the State's primary theory of the case, that of vicarious liability. Instead of evaluating the totality of the evidence, the trial court selected a narrow portion of the testimony that it deemed supportive of the juveniles' potential trial defenses of renunciation and duress. While these potentially dispositive defenses could properly be considered in the trial court's determination of the waiver application, any defenses must be reviewed in the context of a fair evaluation of all of the evidence. That was not done here. The trial judge selectively accepted two comments by A.D. # 2 as if they nullified the entirety of the evidence presented by the State. The trial court failed to analyze the record under the standard of probable cause. These several findings constituted a clear error of judgment. *R.G.D., supra,* 108 *N.J.* at 15, 527 *A.*2d 834.[10]

---

[10] In light of this holding, we do not address the contentions of the parties regarding whether the trial court was motivated by bias. *V.A., supra,* 212 *N.J.* at 18, 50 *A.*3d 610.

We need not, and do not, determine whether the prosecution can present sufficient evidence to prove guilt beyond a reasonable doubt, or evaluate defenses that the juveniles may assert at trial. However, the evidence presented at the probable cause hearing and the reasonable inferences derived from that evidence give rise to a well-grounded suspicion or belief that both A.D. # 1 and A.D. # 2 committed the offenses charged. This is particularly true in light of the law of conspiracy codified in *N.J.S.A.* 2C:5-2 and developed in our case law, the test for accomplice liability under *N.J.S.A.* 2C:2-6(b)(3) and *N.J.S.A.* 2C:2-6(c)(1), and the doctrine of transferred intent codified in *N.J.S.A.* 2C:2-3. Accordingly, we concur with the Appellate Division panel that the trial court improperly denied the State's application for waiver of both juveniles into adult criminal court under *N.J.S.A.* 2A:4A-26.

## VIII.

The judgment of the Appellate Division is affirmed and the matter is remanded to the trial court for proceedings consistent with this opinion.

Justice ALBIN, dissenting.

The majority's acknowledgement that waiver of jurisdiction "is 'the single most serious act that the juvenile court can perform,'" is difficult to reconcile with today's opinion. *See ante* at 215, 52 *A.*3d at 1032-33 (quoting *State v. R.G.D.,* 108 *N.J.* 1, 4, 527 *A.*2d 834 (1987)). That is because the majority opinion signals that the family court will play only a perfunctory, almost meaningless, role in determining whether a juvenile is waived to adult court. In this case, after reviewing an extensive record, the family court judge determined that the State failed to establish probable cause that the two juvenile defendants committed murder and conspiracy to commit murder—a prerequisite for transferring jurisdiction to adult court. The judge made particularized factual findings to support his decision.

In affirming the reversal of that decision, the majority simply abandons the appellate standard of review and the traditional deference shown to a family court's factual determinations. Indeed, the standard of review is turned on its head. Instead of deciding whether there was substantial, credible evidence to support the family court's factual findings, the majority makes its own independent findings that there is sufficient evidence to support the State's argument favoring probable cause. By failing to defer to the family court's determination, the majority deprives the two defendant juveniles of "all the protective and rehabilitative possibilities available to the Family Part." *R.G.D., supra,* 108 *N.J.* at 5, 527 *A.*2d 834.

In the end, the two juveniles will be waived to adult court, despite the family court judge's detailed findings that the murder and conspiracy to commit murder charges are based on flimsy evidence and speculative inferences. Because the majority does not have justifiable grounds to second-guess those findings, I respectfully dissent.

I.

A.

The following brief summary of events is based on evidence in the record.

On August 18, 2009, juvenile defendants A.D. # 1 and A.D. # 2 and two friends were involved in a brawl with Luis Vasquez and a number of Luis's adult friends. A.D. # 2 lived in the same house with Luis, his maternal uncle, with whom he evidently had bad blood. Outnumbered, A.D. # 1 and A.D. # 2 and their friends got the short end of the fight, and both A.D. # 1 and A.D. # 2 were injured. Immediately afterwards, A.D. # 2 said to Luis, "we'll be back ... you just f* *ked up ... you just hit King Angel's son ... don't worry we'll be back." After the fight, A.D. # 1 called his father, Angel Ramos, a member of the Latin Kings gang. He

apparently told his father what had happened and where he was located.

A.D. # 1 and A.D. # 2 waited in front of a liquor store near 30 Ryan Street, Woodbridge, where the fight had occurred. Shortly thereafter, a caravan of two vehicles arrived, a car carrying Ramos and two other occupants and a black SUV with tinted windows containing an unknown number of passengers. Ramos was extremely angry. A.D. # 2 pleaded with Ramos to let him leave, but he was told to get his "ass in the car." Inside the car, A.D. # 2 told Ramos's cohorts, "it's not even a big deal . . . we'll just fight them another time." A.D. # 1 also tried to persuade his father to cool off, "yo don't do this." Unpersuaded, Ramos drove the two juveniles to 30 Ryan Street, where A.D. # 2 lived with his Uncle Luis, his parents, and other members of his extended family.

On their arrival, Ramos ordered A.D. # 2 to go into his house and tell his Uncle Luis to come outside. A.D. # 2 was "really scared" and obeyed Ramos's command. He entered and told Luis, "they want to talk to you outside." Discretion being the better part of valor, Luis, along with his girlfriend, ran up to the second floor of the house. In the meantime, A.D. # 2's mother, father, and other relatives attempted to barricade the front door as several unidentified individuals exited the black SUV and ran toward the house. One of those individuals fired a number of shots through the front door. A.D. # 2's mother was wounded in the left thigh, right arm, left armpit, and right chest; A.D. # 2's uncle, Angel Vasquez, was struck in the chest and died.

## B.

In making its findings, the court reviewed myriad documents, including four statements taken from A.D. # 2, as well as testimony given at the probable-cause hearing. Here are the findings and reasoning of the family court.

1. "[Luis] Vasquez and several of his friends . . . beat up [A.D. # 2 and A.D. # 1] and several of their friends."

2. "A.D. # 1 placed a phone call to his father, Angel [Ramos] ... on [A.D. # 2's] phone" and "explained to his father what happened."

3. "After arriving at the juvenile's location, Angel [Ramos] would not allow the boys to leave, and told [them] to get into the car."

4. Ramos drove the juveniles to 30 Ryan Street and, once there, told A.D. # 2 "to go into the house" and "bring out" his Uncle Luis.

5. While A.D. # 2 was inside, "two males entered the foyer of the house, at which point there were six shots [fired] through a door in the first floor apartment." The gunfire seriously wounded A.D. # 2's mother and killed his Uncle Angel.

6. As a result of the call to Ramos, the juveniles could not have anticipated anything more than an assault.

7. Once Ramos arrived, he "took complete control of the situation" and ordered the two juveniles about.

8. A.D. # 1 "was visibly upset about the intensity of the developing situation" and attempted "to dissuade his father" from acting.

9. Ramos sent "A.D. # 2 into the house where [he] lived," and A.D. # 2 did not "really comprehend what was about to transpire." "It makes absolutely no sense that [A.D. # 2] participated in a conspiracy to ... kill his mother."

10. A.D. # 2 "was just doing what he was told by a very angry and aggressive and hostile individual."

11. After the shooting, A.D. # 2 called 9-1-1 for help, and did not know who did the shooting or "know what happened."

12. The evidence does not reveal an "agreement" "between [A.D. # 1 and A.D. # 2] and Angel [Ramos] to commit a murder or an attempted murder."

13. The evidence does not tie[ ] A.D. # 1 and A.D. # 2 to murder, [or] to [ ] conspiring to murder."

14. The two juveniles did not "[know] about the weapon" and "were intimidated and really being forced to participate."

The court considered the full range of evidence presented by the State, gave it the benefit of reasonable inferences, and applied the probable-cause standard—whether there was a "well-grounded suspicion" to believe the juveniles committed murder and conspiracy to commit murder. *See State v. J.M.*, 182 *N.J.* 402, 417, 866 *A.*2d 178 (2005). Analogizing the family court's role to that of a grand jury, the court had to decide whether "the State ha[d] presented evidence which[,] together with the reasonable inferences [that could be drawn] from that evidence, leads [to the conclusion] that (1) a crime has been committed and (2) the accused has committed it." Standard Grand Jury Charge (Promulgated by Directive # 6–06), at 2 (April 25, 2006).

The court determined that, although "initially A.D. # 2 and A.D. # 1 would have been interested in getting some retaliation ... there's no evidence that they ever anticipated it would escalate to murder." Thus, the court concluded that the State did not sustain its burden of showing that there was probable cause to support the murder and conspiracy to commit murder charges. The court, however, did find the evidence sufficient to support assault charges.

## II.

In determining whether waiver of a juvenile from the family court to adult court is appropriate, "the criminal justice system reposes this solemn responsibility in the sound discretion of the trial court." *R.G.D., supra,* 108 *N.J.* at 15, 527 *A.*2d 834. So long as the "findings of fact [are] grounded in competent, reasonably credible evidence" and the "correct legal principles [are] applied," an appellate court should not interfere with the family court's "exercise of discretion" absent "a clear error of judgment that shocks the judicial conscience." *Ibid.* In other words, the family court's "decision should not be subjected to second-guessing in the appellate process." *Ibid.* The family court does not serve as a rubber stamp when the prosecutor decides on proceeding with waiver. Nor is it a barometer of public opinion, for, as this Court has said, "we must be conscious of avoiding the possibility of public outrage being a determinative factor in a transfer decision." *Ibid.* Moreover, we have long held that family court decisions are entitled to special deference "[b]ecause of the family courts' special jurisdiction and expertise in family matters." *Cesare v. Cesare,* 154 *N.J.* 394, 413, 713 *A.*2d 390 (1998).

## III.

The majority has failed to refer to or abide by these canons of appellate review. In addition, the majority draws the wrong conclusions from its analogy to judicial review of a grand-jury action. The adjudication by the family court in this case is comparable to a grand jury returning a no bill, where there is

essentially a finding of no probable cause, rather than a true bill, where there is a finding of probable cause. Thus, the majority is correct that, in reviewing the validity of an indictment, an appellate or trial court "should evaluate whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it," *State v. Morrison,* 188 *N.J.* 2, 13, 902 *A.*2d 860 (2006). *See ante* at 219, 52 *A.*3d at 1035. However, when the grand jury does not return an indictment, there is no judicial review of that determination. To be sure, the State may re-present the matter before the grand jury, but the grand jury's decision cannot be reversed.

Accordingly, an analogy to the review of grand-jury decisions counsels deference to the family court's adjudication. Instead, the majority has given a virtual blank check to the State, viewing the record to see whether any combination of evidence or inferences—however farfetched—will support its waiver determination. Our family court judges are not potted plants; they have a role to play in the probable-cause determination at waiver hearings. Any fair reading of the record reveals that the evidence that these juveniles committed murder or conspired to do so is thin at best. Ordinarily, we do not overthrow a trial court's findings even if, in a close case, we "might have reached a different conclusion" had we sat as the decision-maker. *State v. Elders,* 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007) (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)) (internal quotation marks omitted). But the majority has done so here. Given the gravity of a waiver hearing, the threshold for probable cause should not be so low that the family court becomes a mere transit station for a one-way trip to adult court. This case, sadly, sets the lowest possible bar for probable cause at a waiver hearing.

## IV.

In conclusion, the majority has disregarded the traditional standards of appellate review and failed to pay deference to the

findings of the family court in a matter of the highest order—the determination of whether to waive a juvenile to adult court. Because I do not find that the family court abused its discretion, I would reverse the Appellate Division and affirm the trial court's denial of waiver. I therefore respectfully dissent.

*For affirmance and remandment*—Chief Justice RABNER and Justices LaVECCHIA, HOENS, and PATTERSON—4.

*For reversal*—Justice ALBIN—1.

*Not Participating*—Judge WEFING (temporarily assigned).